[No. S080284. Feb. 21, 2002.]

BARRY KEENAN, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FRANK SINATA, JR., Real Party in Interest.

414

**COUNSEL**

Rohde & Victoroff and Stephen F. Rohde for Petitioner.

Dilan A. Esper; Peter J. Eliasberg and Mark D. Rosenbaum for ACLU Foundation of Southern California as Amicus Curiae on behalf of Petitioner.

Weil, Gotshal & Manges, R. Bruce Rich, Jonathan Bloom, Heather R. Goldstein, Josh A. Krevitt and Christopher J. Cox for The Association of American Publishers, Inc., The American Booksellers Foundation for Free Expression, Magazine Publishers of America, Inc., and PEN American Center as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Corbett & Steelman, Richard B. Specter and Mark M. Monachino for Real Party in Interest.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Carole Ritts Kornblum, Assistant Attorney General, Peter K. Shack and Kelvin C. Gong, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest.

**OPINION**

**BAXTER, J.**—We confront a claim that California's "Son of Sam law" facially violates constitutional protections of speech by appropriating, as compensation for crime victims, all monies due to a convicted felon from expressive materials that include the story of the crime. We conclude that

these provisions of the California statute are facially invalid under both the free speech clause of the First Amendment to the federal Constitution[1] as applied to the states through the Fourteenth Amendment, and the liberty of speech clause of the California Constitution (art. I, § 2, subd. (a)).[2]

The California law was first enacted in 1983 as Civil Code section 2224.1.[3] (Stats. 1983, ch. 1016, § 2, pp. 3581-3584.) In 1986, the law was renumbered as section 2225 (Stats. 1986, ch. 820, §§ 7, 8, pp. 2730-2733), and it has since been amended on several occasions (see Stats. 1992, ch. 178, § 2, p. 882; Stats. 1994, ch. 556, § 1, p. 2823; Stats. 1995, ch. 262, § 1; Stats. 2000, ch. 261, § 2). As currently in effect, the law seeks to prevent a convicted felon, or a profiteer, from exploiting the felon's crimes for financial gain while victims of crime go uncompensated.

One prong of the California statute, in effect since the law's inception, imposes an involuntary trust, in favor of damaged and uncompensated crime victims as "beneficiar[ies]," on a convicted felon's "proceeds" from expressive "materials" (books, films, magazine and newspaper articles, video and sound recordings, radio and television appearances, and live presentations) that "include or are based on" the "story" of a felony for which the felon was convicted, except where the materials mention the felony only in "passing . . . , as in a footnote or bibliography." (§ 2225, subds. (a)(4), (6), (7), (9), (b)(1); see former § 2224.1, subds. (a)(4), (6), (7), (9), (b), Stats. 1983, ch. 1016, § 2, p. 3581.) For convenience, we sometimes hereafter refer to this portion of the statute, governing proceeds from expressive materials that include the story of the crime, by its operative provision, section 2225, subdivision (b)(1) (section 2225(b)(1)).

More recent amendments to the California statute attack the financial exploitation of crime from a second, distinctly different angle. Since 1994, the law's involuntary trust provisions have also applied to "profits" received by the felon, or his or her representative, from the sale or transfer of *any* "thing" or "right," the *value* of which "is *enhanced* by the *notoriety* gained from the commission of a felony for which a convicted felon was convicted." (§ 2225, subd. (a)(10), italics added; see also *id.*, subd. (b)(2).) In 2000, the involuntary trust provisions were further extended, with limited exceptions, to "profiteer[s] of the felony," i.e., "any person[s]" who derive income by selling memorabilia, property, rights, or things for values enhanced by their felony-related notoriety. (§ 2225, subds. (a)(3)(B), (10),

---

[1] "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

[2] "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).)

[3] All statutory references are to the Civil Code unless otherwise stated.

(b)(2).) As necessary, we sometimes hereafter refer to this prong of the statute, governing profits from things sold for their felony-related notoriety value, by its operative provision, section 2225, subdivision (b)(2) (section 2225(b)(2)).[4]

In 1991, the United States Supreme Court held that a somewhat similar New York law violated the First Amendment. (*Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.* (1991) 502 U.S. 105 [112 S.Ct. 501, 116 L.Ed.2d 476] (*Simon & Schuster*).) In provisions somewhat like California's section 2225(b)(1), the statute at issue confiscated, for the benefit of crime victims, all monies a criminal was due under contract with respect to a "reenactment" of the crime, or from the expression of his or her personal thoughts or feelings about the crime, in a film, broadcast, print, recording, or live performance format.

Finding the New York law facially invalid, the *Simon & Schuster* majority reasoned that the statute, as a direct regulation of speech based on content, must fall unless it satisfied a strict level of constitutional scrutiny. The New York law failed this test, said the majority, because although the state had a compelling interest in compensating crime victims from the fruits of crime, the statute at issue was not narrowly tailored to that purpose. (*Simon & Schuster, supra,* 502 U.S. 105, 121-123 [112 S.Ct. 501, 511-512].)

The flaw most clearly identified by the *Simon & Schuster* majority was that the New York statute was overinclusive. The majority noted two respects in which the New York law regulated speech too broadly for its compelling purpose. First, the law applied to expressive works in which one merely *admitted* crimes for which he or she had not been convicted. Second, it confiscated all profits from expressive works in which one made even *incidental or tangential* mention of his or her past crimes for nonexploitative purposes. (*Simon & Schuster, supra*, 502 U.S. 105, 121 [112 S.Ct. 501, 511].)

 California's analogous provision, section 2225(b)(1), similarly imposes a content-based financial penalty on protected speech. Yet section 2225(b)(1), like its New York counterpart, fails to satisfy strict scrutiny because it, too, is overinclusive. Section 2225(b)(1) contains the fundamental defect identified in *Simon & Schuster*; it reaches beyond a criminal's profits from the crime or its exploitation to reach all income from the

---

[4]As indicated in detail below, this case does not, in fact, present a challenge to section 2225(b)(2), the distinct portion of the statute that confiscates profits from memorabilia, property, things, or rights sold for values enhanced by their felony-related notoriety value. We therefore do not address the constitutionality of this clearly severable provision. (See Stats. 2000, ch. 261, § 3.)

criminal's speech or expression on any theme or subject, if the story of the crime is included.

Though section 2225(b)(1), unlike the New York law, applies only to persons actually convicted of felonies, and states an exemption for mere "passing mention of the felony, as in a footnote or bibliography" (*id.*, subd. (a)(7)), these differences do not cure the California statute's constitutional flaw. By any reasonable construction, the California statute is still calculated to confiscate all income from a wide range of protected expressive works by convicted felons, on a wide variety of subjects and themes, simply because those works include substantial accounts of the prior felonies.

Because we conclude, contrary to the Court of Appeal, that section 2225(b)(1) is invalid, we will reverse the judgment of the Court of Appeal.

## FACTS

On July 8, 1998, Frank Sinatra, Jr. (Sinatra, Jr.), son of the late singer, filed a complaint in Los Angeles Superior Court. Named as defendants were Barry Keenan, Joseph Amsler, John Irwin, Peter Gilstrap, Columbia Pictures (a division of Sony Pictures Entertainment, Inc.), and New Times, Inc. (New Times).

As pertinent here, the complaint alleged as follows: In 1963, Keenan and Amsler, acting pursuant to a conspiracy with Irwin, kidnapped Sinatra, Jr., from his Nevada hotel room and drove him to Los Angeles, where he was held until his father paid a ransom. During his captivity, Sinatra, Jr., suffered economic loss, physical suffering, and emotional distress. Keenan, Amsler, and Irwin were later apprehended, tried, convicted of felony offenses, and incarcerated under California law.[5] Following their arrests, the kidnappers made media statements, since admitted to be false, that Sinatra, Jr., had conspired in his own kidnapping to extract money from his father. These defamatory statements caused further damage to Sinatra, Jr.'s business and reputation.

The complaint further alleged: In January 1998, Keenan and one or both accomplices arranged with Gilstrap, or with New Times (publisher of New Times Los Angeles, a tabloid magazine), for Gilstrap to interview Keenan

---

[5]In a memorandum of points and authorities accompanying his subsequent motion for a preliminary injunction, Sinatra, Jr., alleged that the kidnappers sustained *federal* convictions (see 18 U.S.C. §§ 2, 371, 875(a), 1201, 1202) and served their time in the federal penitentiary, but nonetheless qualify as "convicted felons" for purposes of section 2225, because they were convicted of felonies, as defined by either California or United States statutes, that were committed in California. (§ 2225, subd. (a)(1), (2).)

about the kidnapping. The purpose was to produce a story for sale to print, broadcast, and film media. Monies derived from exploiting the kidnapping story would be split among Gilstrap, New Times, and the kidnappers. An article entitled *Snatching Sinatra*, authored by Gilstrap, appeared in a January 1998 issue of New Times Los Angeles. In late January 1998 and thereafter, other magazines reported that Columbia Pictures had bought the motion picture rights to *Snatching Sinatra* for up to $1.5 million. In February 1998, citing section 2225, Sinatra, Jr., made demand on Columbia Pictures to withhold from the kidnappers, and from Gilstrap and New Times as the kidnappers' "representatives," any monies otherwise due such persons or entities for the motion picture rights. Columbia Pictures refused to do so without a court order.

The complaint asserted that under section 2225, all monies due to the kidnappers, or to their "representatives" Gilstrap and New Times, for preparation for sale of the story of Sinatra, Jr.'s, kidnapping, the sale of the rights to the story, or the sale of materials that included or were based on the story, were "proceeds" as defined by subdivision (a)(9) and "profits" as defined by subdivision (a)(10), and were thus subject to an involuntary trust in favor of Sinatra, Jr., a statutory "beneficiary" (*id.*, subd. (a)(4)(A)). The complaint sought an order that the defendants, particularly Columbia Pictures and New Times, hold such present and future proceeds and profits in trust for Sinatra, Jr. It also sought an injunction to (1) prevent Columbia Pictures and New Times from paying such proceeds and profits to any other defendant, and (2) require that all such payments be made instead to Sinatra, Jr., to the extent of his damages or, in the alternative, to the superior court for distribution for the benefit of the victims of the kidnapping.

On August 5, 1998, after a hearing at which only Sinatra, Jr., Columbia Pictures, and New Times appeared, the trial court issued a preliminary injunction prohibiting Columbia Pictures, during the pendency of the action, from paying any monies to Keenan, Amsler, Irwin, or their representatives or assigns in connection with the motion picture rights to the story of Sinatra, Jr.'s, kidnapping.[6]

On November 19, 1998, Keenan first appeared in the action by filing, on his own behalf only, a demurrer to the complaint. At the same time, Keenan moved to dissolve the preliminary injunction. The demurrer asserted, among other things, that section 2225 was facially invalid under the speech clauses

---

[6]In his written motion for a preliminary injunction, Sinatra, Jr., had sought similar injunctive relief against New Times and Gilstrap, but prior to the August 5, 1998, hearing on the motion, Sinatra, Jr., stipulated he would not proceed at that time with the injunctive portion of his application.

of the federal and state Constitutions. Keenan's constitutional attack was based solely on a comparison between section 2225 and the New York law struck down in *Simon & Schuster, supra*, 502 U.S. 105.

In this regard, Keenan noted that because the California statute, like its New York counterpart, targeted a criminal's income from telling the story of his crime, it penalized the content of speech, required strict scrutiny, and was not narrowly tailored to compensate crime victims from the profits of crime. Keenan urged that, by the standards set forth in *Simon & Schuster, supra*, 502 U.S. 105, the California statute was both underinclusive, because it reached only expressive activity, not other sources of crime-related income, and overinclusive, because it penalized all expressive works by convicted felons which included more than passing mention of their crimes.

In response, Sinatra, Jr., asserted that the *Simon & Schuster* majority had only found New York's law overinclusive. Sinatra, Jr., argued that section 2225 solves the overinclusiveness problem identified in *Simon & Schuster* by covering only "convicted" felons and exempting expressive materials that contain only a "passing mention of [the] felony." Moreover, he contended, section 2225 is not underinclusive because it is precisely drawn to ensure that victims of crime are compensated before the felon profits from telling the story of their victimization.

On December 22, 1998, the trial court issued an order overruling Keenan's demurrer "for the reasons stated in [Sinatra, Jr.'s,] opposition papers." In the same order, the court denied Keenan's motion to dissolve the preliminary injunction, reiterating its findings, made when the injunction was granted, that "section 2225 [is] not unconstitutional as written . . . [and] . . . was narrowly drafted to overcome the over-inclusive effects found by the Supreme Court" in *Simon & Schuster*.

On December 31, 1998, Keenan filed in the Court of Appeal the instant petition for mandate or other appropriate relief. The petition requested a writ directing the superior court to vacate its orders overruling his demurrer and granting the preliminary injunction, to enter a new order sustaining the demurrer without leave to amend, and to dissolve the preliminary injunction. On January 14, 1999, the Court of Appeal stayed proceedings in the trial court, ordered the parties to appear for oral argument on the merits of the petition, and called for the filing of a return and reply.[7]

The parties' briefs in the Court of Appeal, like those in the trial court, focused entirely on comparisons between California's Son of Sam law and

---

[7]We deem this procedure as equivalent to an order for the issuance of an alternative writ, and the parties have proceeded under that assumption. (But see Code Civ. Proc., §§ 1086-

the New York counterpart addressed in *Simon & Schuster*. Again Keenan claimed the California statute singled out expressive activity for regulation on the basis of content, required strict scrutiny, and was both overinclusive and underinclusive by the standards set in that case. Again Sinatra, Jr., urged that section 2225 solved the *overinclusiveness* problem identified in *Simon & Schuster* because, unlike the New York statute, California's law applied only to convicted felons and exempted expressive materials which made mere "passing mention" of the felony.

The Court of Appeal denied writ relief, concluding, among other things, that section 2225 does not infringe constitutional rights of speech. In this regard, the Court of Appeal accepted Sinatra, Jr.'s, arguments that section 2225 lacks the defects of overbreadth identified in *Simon & Schuster*, because it is limited to convicted felons and does not confiscate a felon's proceeds from expressive materials that contain mere "passing mention" of the felony.

The Court of Appeal declined to decide whether the California statute was impermissibly underinclusive. The court reasoned it need not do so because, contrary to Keenan's insistence, *Simon & Schuster* had not expressly found the New York statute underinclusive. Because Keenan "does not otherwise elaborate on the issue of underinclusiveness," said the court, "[a]nd since [his] attack on section 2225 is limited to those issues considered in *Simon & Schuster*, our discussion of the statute is similarly limited." We granted review.[8] We now reverse.

## DISCUSSION

In the late 1970's, New York was terrorized by serial killer David Berkowitz, popularly known as the Son of Sam. By the time Berkowitz was apprehended, publicity about the case had enhanced the value of the rights to his story. New York's Legislature sought to prevent Berkowitz and other notorious criminals from exploiting for profit the tales of their sensational crimes while their victims went uncompensated. The resulting statute, discussed in greater detail below, was dubbed the "Son of Sam law." (*Simon &*

1087; *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-178 [203 Cal.Rptr. 626, 681 P.2d 893].)

[8] In addition to the parties' briefs on the merits in this court, several amicus curiae briefs have also been filed. The Attorney General of California (Attorney General) has filed an amicus curiae brief in support of Sinatra, Jr. In support of Keenan, an amicus curiae brief has been filed on behalf of the ACLU Foundation of Southern California (ACLU), and a joint amicus curiae brief has been filed on behalf of the Association of American Publishers, Inc., The American Booksellers Foundation for Free Expression, Magazine Publishers of America, Inc., and PEN American Center.

*Schuster, supra,* 502 U.S. 105, 108-110 [112 S.Ct. 501, 504-505].) In 2000, the United States and over 40 states, including California, had some form of Son of Sam law. (See Kealy, *A Proposal for a New Massachusetts Notoriety-for-Profit Law: The Grandson of Sam* (2000) 22 W. New Eng. L.Rev. 1, 22; Comment, *Son of Sam Laws: Killing Free Speech or Promoting Killer Profits?* (1999) 20 Whittier L.Rev. 949, 953, & fns. 48, 49.)[9]

California's version, as pertinent here, provides that all past and future "proceeds" (§ 2225, subds. (a)(9), (b)(1)) paid or owing to a "convicted felon" (*id.,* subds. (a)(1), (b)(1)) from the sale of expressive "materials"[10] or the rights thereto (§ 2225, subds. (a)(6), (b)(1)) are subject to an involuntary trust for designated "beneficiaries" (§ 2225(b)(1)) if the materials "include or are based on the story" of the felony (*ibid.*). A "convicted felon" is one "convicted . . . , or found not guilty by reason of insanity" (*id.,* subd. (a)(1)) of a felony, as defined by "any California or United States statute" (*id.,* subd. (a)(2)), that was committed in California (*id.,* subd. (a)(1)). "Story" means "a depiction, portrayal, or reenactment of a felony" but "shall not be taken to mean a passing mention of the felony, as in a footnote or bibliography." (*Id.,* subd. (a)(7).) A "beneficiary" is one who has a legal claim against the convicted felon, including a survivorship or wrongful death claim, for physical, mental, or emotional injury, or pecuniary loss, caused by the felony. (*Id.,* subd. (a)(4).)

The trust continues for five years from the conviction, or from the payment of any covered proceeds to the felon, whichever is later. (§ 2225(b)(1).) The felon's unpaid obligations for restitution, restitution and penalty fines, and crime-related attorney fees have first priority against the trust. (*Id.,* subd. (d).) Within the five-year trust period, beneficiaries may bring actions to recover their respective interests in the remaining funds (*id.,* subd. (c)(1),(2)), and the filing of such an action extends the trust period until such actions are concluded (*id.,* subd. (b)(1)). Each beneficiary's interest is an equitable share, given the funds available, of his or her recoverable damages from the crime, less any compensation already received from the felon or from the Restitution Fund (*id.,* subds. (a)(5), (d)). Payment to the beneficiary may be ordered from proceeds already received

---

[9]"Ironically, the [New York] statute was never applied to the Son of Sam himself; David Berkowitz was found incompetent to stand trial, and the statute at that time applied only to criminals who had actually been convicted. [Citation.] According to the [New York State Crime Victims] Board, Berkowitz voluntarily paid his share of the royalties from the book Son of Sam, published in 1981, to his victims or their estates. [Citation.]" (*Simon & Schuster, supra,* 502 U.S. 105, 111 [112 S.Ct. 501, 506].)

[10]Section 2225, subdivision (a)(6) defines "materials" as "books, magazine or newspaper articles, movies, films, videotapes, sound recordings, interviews or appearances on television and radio stations, and live presentations of any kind."

by the felon and, as necessary, from proceeds to be received in the future. (*Id.*, subd. (c)(3).)

Within one year after the conviction or the felon's receipt of covered proceeds, whichever is later (§ 2225, subd. (e)(2)), the Attorney General may also bring an action to impose an "express trust" on covered proceeds, thus requiring their placement in a bank depositary (*id.*, subd. (e)(1); see also *id.*, subd. (e)(3)), if he proves it is "more probable than not" that there are beneficiaries entitled to compensation for the felony (*id.*, subd. (e)(3)). Either a beneficiary or the Attorney General may, in appropriate circumstances, obtain a preliminary injunction to prevent waste of proceeds subject to the involuntary trust. (*Id.*, subd. (f)(1), (2).)

Funds subject to the trust, but not claimed by a beneficiary at the end of the trust period, do not revert to the felon's ownership. Instead, they must be transferred to the Controller for allocation to the Restitution Fund. (§ 2225(b)(1); see also *id.*, subd. (e)(3).)

As indicated above, the United States Supreme Court struck down a similar New York law in *Simon & Schuster, supra,* 502 U.S. 105. We conclude the analysis of *Simon & Schuster* governs this case and renders section 2225(b)(1) invalid as well. Both the New York and California laws impose content-based financial penalties on protected speech. Thus they must, at a minimum, satisfy strict constitutional scrutiny. Both laws seek to serve compelling interests in preventing criminals from exploiting their crimes for profit, and in compensating crime victims from the profits of crime. Yet both laws are *overinclusive* for those purposes, because they confiscate all income from all expressive materials, whatever their general themes or subjects, that include significant discussions of their creators' past crimes.

Our reasoning requires, of course, a detailed examination of *Simon & Schuster*. The New York statute there at issue provided that if any person "accused or convicted of a crime in this state" was due money under contract with respect to a "reenactment" of the crime " 'by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, [or] live entertainment of any kind,' " or for expressions of the person's thoughts or feelings about the crime, the contract must be reported to the New York State Crime Victims Board (New York Board), and the money due must be paid over to the New York Board to be placed in an escrow account, primarily for the benefit of victims who, within five years thereafter, won money judgments against the criminal. (*Simon & Schuster, supra,* 502 U.S. 105, 109 [112 S.Ct. 501, 504-505]; see N.Y. Exec. Law

§ 632-a(1), (4) (McKinney 1982 & 1991 supp.).) The statute defined "convicted" persons to include those who had "voluntarily and intelligently admitted" crimes for which they were not prosecuted. (*Simon & Schuster, supra*, at p. 110 [112 S.Ct. at p. 505], italics omitted; N.Y. Exec. Law § 632-a(10)(b).).)[11]

While the law was in effect, Simon & Schuster, Inc., contracted to finance and publish a book by Henry Hill, a former gangster turned government witness. The book would tell the story of Hill's organized crime career. After considerable investment of time and effort by Hill and his coauthor, the book, Wiseguy, was published in 1986. Its colorful account of Hill's many criminal exploits, and of life inside the Mafia, met with commercial and critical success.

When the New York Board learned of Wiseguy's publication, it invoked the Son of Sam law. After reviewing the book, and Simon & Schuster's contract with Hill, the New York Board determined that all monies paid or owed to Hill under the contract were subject to the statute's escrow provisions. Simon & Schuster was ordered to pay the New York Board all future sums due to Hill, and Hill was ordered to pay the New York Board all sums already remitted to him. Simon & Schuster filed a federal suit, seeking a declaration, under 42 United States Code section 1983, that the New York law was facially invalid under the First Amendment. The federal district court granted the New York Board's motion for summary judgment, and a divided court of appeals affirmed. (*Simon & Schuster, supra*, 502 U.S. 105, 115 [112 S.Ct. 501, 507-508].)

The United States Supreme Court unanimously concluded that the judgment of the court of appeals must be reversed.[12] Six justices, in an opinion authored by Justice O'Connor, first noted that "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech. *Leathers* v. *Medlock*, 499 U. S. 439, 447 [111 S.Ct. 1438, 1443-1444, 113 L.Ed.2d 494] (1991). . . . [¶] . . . In the context of financial regulation, it bears repeating, as we did in

---

[11]The New York law, like section 2225(b)(1), established priorities of claims against the account, including the criminal's valid claim for expenses of legal representation. (*Simon & Schuster, supra*, 502 U.S. 105, 110 [112 S.Ct. 501, 505]; see N.Y. Exec. Law § 632-a(7), (8), (11).) Unlike section 2225(b)(1), the New York law allowed general creditors of the criminal to reach the impounded funds (*Simon & Schuster, supra*, at p. 110 [112 S.Ct. at p. 505]; see N.Y. Exec. Law § 632-a(11)(c)), but provided that if no claims against the account were pending at the end of the five-year period, remaining funds in the account would be repaid to the criminal (*Simon & Schuster, supra*, at p. 109 [112 S.Ct. at pp. 504-505]; see N.Y. Exec. Law § 632-a(4)).

[12]Justice Thomas did not participate.

*Leathers*, that the government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace. 499 U. S., at 448-449 [111 S.Ct. at pp. 1444-1445]. The First Amendment presumptively places this sort of discrimination beyond the power of the government." (*Simon & Schuster, supra*, 502 U.S. 105, 115-116 [112 S.Ct. 501, 508].)

New York's Son of Sam law was a presumptively invalid content-based burden on speech, said the majority, because "[i]t singles out income derived from expressive activity for a burden the State places on no other income, . . . is directed only at works with a specified content," and "plainly imposes a financial disincentive only on speech of a particular content." (*Simon & Schuster, supra*, 502 U.S. 105, 116 [112 S.Ct. 501, 508].) Because the statute penalized speech on the basis of its content, the majority concluded, the law must survive "strict" constitutional scrutiny, i.e., " 'the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' [Citation.]" (*Id.*, at p. 118 [112 S.Ct. at p. 509].)

The majority emphasized that the state had no compelling interest in shielding readers and victims from negative emotional responses to a criminal's public retelling of his misdeeds. Indeed, the majority observed, the protection of offensive and disagreeable ideas is at the core of the First Amendment. (*Simon & Schuster, supra*, 502 U.S. 105, 118 [112 S.Ct. 501, 509-510].) On the other hand, the majority agreed, states do have compelling interests in "ensuring that victims of crime are compensated by those who harm them" (*ibid.*), "preventing wrongdoers from dissipating their assets before victims can recover" (*ibid.*), "ensuring that criminals do not profit from their crimes" (*id.*, at p. 119 [112 S.Ct. at p. 510]), and transferring the fruits of crime from the criminals to their victims (*id.*, at pp. 119-120 [112 S.Ct. at pp. 510-511]). Moreover, the majority concluded it could "assume without deciding" that royalties from a criminal's book about his crimes, the form of income at issue in the case before it, "represent[] the fruits of crime." (*Id.*, at p. 119 [112 S.Ct. at p. 510].)

Of course, the majority observed, New York could not defend its statute by narrowly defining the interest at stake in terms of the actual operation of its law. New York claimed a compelling interest in preventing criminals from retaining the profits of *storytelling* about their crimes before their victims were compensated. However, the majority noted, the state could not show why it had a greater interest in compensating crime victims from the profits of such storytelling than from the criminal's other assets. "Nor [could the state] justif[y] . . . a distinction between this expressive activity and any

other activity in connection with its interest in transferring the fruits of crime from criminals to their victims." (*Simon & Schuster*, 502 U.S. 105, 119-120 [112 S.Ct. 501, 510].) "In short," the majority concluded, "the State has a compelling interest in compensating victims from the fruits of the crime, but little if any interest in limiting such compensation to the proceeds of the wrongdoer's speech about the crime." (*Id.*, at pp. 120-121 [112 S.Ct. at p. 511].)

Accordingly, the majority reasoned, it must examine whether New York's statute was "narrowly tailored to advance the former, not the latter, objective." (*Simon & Schuster, supra*, 502 U.S. 105, 121 [112 S.Ct. 501, 511].) The New York statute was not so tailored, the majority determined, for "[a]s a means of ensuring that victims are compensated from the proceeds of crime, the Son of Sam law is significantly *overinclusive*." (*Ibid.*, italics added.) In the majority's view, two factors in particular illustrated the statute's overbreadth. First, "the statute applies to works on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally. [Citation.]" (*Ibid.*, italics in original.) Second, "the statute's broad definition of 'person convicted of a crime' enables the Board to escrow the income of any author who admits in his work to having committed a crime, whether or not the author was ever actually accused or convicted. [Citation.]" (*Ibid.*)

"These two provisions," said the majority, "combine to encompass a potentially very large number of works. Had the Son of Sam law been in effect at the time and place of publication, it would have escrowed payment for such works as The Autobiography of Malcolm X, which describes crimes committed by the civil rights leader before he became a public figure; Civil Disobedience, in which Thoreau acknowledges his refusal to pay taxes and recalls his experience in jail; and even the Confessions of Saint Augustine, in which the author laments 'my past foulness and the carnal corruptions of my soul,' one instance of which involved the theft of pears from a neighboring [orchard]. [Citations.] *Amicus* Association of American Publishers, Inc., has submitted a sobering bibliography listing hundreds of works by American prisoners and ex-prisoners, many of which contain descriptions of the crimes for which the authors were incarcerated, including works by such authors as Emma Goldman and Martin Luther King, Jr. A list of prominent figures whose autobiographies would be subject to the statute if written is not difficult to construct: The list could include Sir Walter Raleigh, who was convicted of treason after a dubiously conducted 1603 trial; Jesse Jackson, who was arrested in 1963 for trespass and resisting arrest after attempting to be served at a lunch counter in North Carolina; and Bertrand Russell, who was jailed for seven days at the age of 89 for participating in a sit-down

protest against nuclear weapons. The argument that a statute like the Son of Sam law would prevent publication of *all* of these works is hyperbole—some would have been written without compensation—but the Son of Sam law clearly reaches a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated." (*Simon & Schuster, supra,* 502 U.S. 105, 121-122 [112 S.Ct. 501, 511], fn. omitted, italics in original.)

In sum, said the majority, New York's Son of Sam law "has singled out speech on a particular subject for a financial burden that it places on no other speech and no other income. The State's interest in compensating victims from the fruits of crime is a compelling one, but the Son of Sam law is not narrowly tailored to advance that objective. As a result, the statute is inconsistent with the First Amendment." (*Simon & Schuster, supra,* 502 U.S. 105, 123 [112 S.Ct. 501, 512].)

In separate opinions, Justices Blackmun and Kennedy concurred in the judgment. Justice Blackmun opined that the New York law was underinclusive as well as overinclusive, and "we should say so." (*Simon & Schuster, supra,* 502 U.S. 105, 123-124 [112 S.Ct. 501, 512-513] (conc. opn. of Blackmun, J.).) Justice Kennedy suggested that a statute is unconstitutional per se if it regulates the specific content of speech which is neither defamatory, nor tantamount to a criminal act, nor an impairment of some other constitutional right, nor an incitement to lawless action, nor calculated to bring about an imminent harm the state has the substantive power to prevent. A statute that regulates the content of speech beyond these narrow limits, said Justice Kennedy, cannot be saved by a finding that it is narrowly tailored to serve a compelling state interest. (*Id.,* at pp. 124-128 [112 S.Ct. at pp. 512-514] (conc. opn. of Kennedy, J.).)[13]

In his efforts to distinguish section 2225(b)(1), Sinatra, Jr., first makes a cursory argument that California's statute, unlike New York's, is not a presumptively invalid content-based regulation of speech. The effort must fail. Section 2225(b)(1), like the New York statute at issue in *Simon & Schuster,* places a direct financial disincentive on speech or expression about a particular subject. The California statute explicitly targets and confiscates a convicted felon's proceeds from books, films, articles, recordings, broadcasts, interviews, or performances that include the story of the felon's crime.

---

[13]One jurisdiction's Son of Sam law has been invalidated since *Simon & Schuster.* (*Bouchard v. Price* (R.I. 1997) 694 A.2d 670, 675-678.) The laws in two other states have been challenged, but the appeals in those matters were decided on grounds other than the constitutionality of the statutes at issue. (See *Rolling v. State ex rel. Butterworth* (Fla.Dist.Ct.App. 1994) 630 So.2d 635; *Curran v. Price* (1994) 334 Md. 149 [638 A.2d 93].)

While certain classes of speech—obscenity, fighting words, some defamation—may be subject to viewpoint-neutral regulation because of their directly injurious nature (see, e.g., *R.A.V. v. St. Paul* (1992) 505 U.S. 377, 382-390 [112 S.Ct. 2538, 3542-3547, 120 L.Ed.2d 305]; *Chaplinsky v. New Hampshire* (1942) 315 U.S. 568, 571-572 [62 S.Ct. 766, 768-769, 86 L.Ed. 1031]), discussions of crime have never been included in this limited category.[14]

Sinatra, Jr., asserts that laws imposing financial penalties on speech do not necessarily violate the First Amendment. He cites cases for the principle that the government need not subsidize the exercise of free speech or other constitutional rights. (E.g., *Lyng v. Automobile Workers* (1988) 485 U.S. 360 [108 S.Ct. 1184, 99 L.Ed.2d 380] [denial of food stamps to household with striking worker]; *Regan v. Taxation With Representation of Wash.* (1983) 461 U.S. 540 [103 S.Ct. 1997, 76 L.Ed.2d 129] [denial of tax exemption to organizations engaged in lobbying]; *Harris v. McRae* (1980) 448 U.S. 297 [100 S.Ct. 2671, 65 L.Ed.2d 784] [denial of federal funds to reimburse abortions].) But he fails to show how section 2225(b)(1), by confiscating income from speech based on its content, departs from the presumptively unconstitutional form of statute at issue in *Simon & Schuster*.

Nor does it matter that New York's law focused on *media entities'* contracts for crime stories, while section 2225(b)(1) targets crime story proceeds in the hands of the criminal himself. As *Simon & Schuster* noted with respect to the facts in that case: "Whether the First Amendment 'speaker' is considered to be Henry Hill, whose income the statute places in

---

[14]Concluding that the New York's Son of Sam law was a content-based regulation of speech, the *Simon & Schuster* majority noted, in a brief passage, that the law "singles out income derived from expressive activity for a burden the State places on no other income." (*Simon & Schuster, supra,* 502 U.S. 105, 116 [112 S.Ct. 501, 508.]) As noted above, California's Son of Sam law has a feature New York's did not; besides confiscating a convicted felon's income from telling his crime story, the California statute, by amendments adopted after *Simon & Schuster*, also confiscates profits earned by a convicted felon, or a profiteer, from the sale of memorabilia, property, things, or rights for a value enhanced by their felony-related *notoriety value.* (§ 2225(b)(2).) Thus, it cannot be said that California's law, read as a whole, burdens income from speech as distinct from *all other crime-related income*. The Attorney General urges that this distinction between the California and New York statutes means the California law is not a content-based regulation of speech. We disagree. California's effort to reach the fruits of crime beyond those derived from storytelling about the crime might bear on whether our statute is unconstitutionally *underinclusive*, an issue we need not and do not decide. However, we do not read this brief language of *Simon & Schuster* to mean that a statute can escape examination as a content-based regulation of speech merely by targeting, in separate provisions, nonspeech income as well. There can be no doubt that section 2225(b)(1) itself meets the definition of a content-based speech regulation; it focuses directly and solely on income from speech and "is directed only at works with a specified content." (*Simon & Schuster, supra,* 502 U.S. 105, 116 [112 S.Ct. 501, 508].)

escrow because of the story he has told, or Simon & Schuster, which can publish books about crime with the assistance of only those criminals willing to forgo remuneration for at least five years, the statute plainly imposes a financial disincentive only on speech of a particular content." (*Simon & Schuster, supra,* 502 U.S. 105, 116 [112 S.Ct. 501, 508].) "The government's power to impose content-based financial disincentives on speech surely does not vary with the identity of the speaker" (*Simon & Schuster, supra,* at p. 117 [112 S.Ct. at p. 509]), and section 2225(b)(1), like the New York statute, "establishes a financial disincentive to *create or publish* works with a particular content" (*Simon & Schuster, supra,* at p. 118 [112 S.Ct. at p. 509], italics added).[15]

 Section 2225(b)(1) is thus a suspect content-based regulation of speech. As such, the section is unconstitutional unless, at a minimum, it is narrowly tailored to serve compelling state interests. (*Simon & Schuster, supra,* 502 U.S. 105, 118 [112 S.Ct. 501, 509-510]; *Sable Communications of Cal., Inc. v. FCC* (1989) 492 U.S. 115, 126 [109 S.Ct. 2829, 2836-2837, 106 L.Ed.2d 93].) In applying this standard, we must first determine what, if any, such compelling interests section 2225(b)(1) seeks to serve.

By its terms, section 2225(b)(1) confiscates, for the benefit of uncompensated victims of crime, sums due or owing to a convicted felon from expressive materials that include the story of the felony. It thus appears the purpose of section 2225(b)(1) is to assure that the "fruits" of one's crimes—in this case, proceeds from exploiting the story of those crimes—will be used to compensate crime victims.

Statements of legislative intent confirm this inference. When the predecessor of section 2225(b)(1) was adopted in 1983, the Legislature declared, as justification for the law, that "[v]ictims of felonies have a special relationship to proceeds from the sale of stories about those felonies which are written by persons convicted of committing them." (Stats. 1983, ch. 1016, § 1, p. 3581.) It further recited that the new law "amplifies [and] supplements [Civil Code] sections 2224 [making one an involuntary trustee, for the

---

[15]By denying compensation for an expressive work, a law may chill not only the free speech rights of the author or creator, but also the reciprocal First Amendment right of the work's audience to *receive* protected communications. (*Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 756 [96 S.Ct. 1817, 1822-1823, 48 L.Ed.2d 346]; see *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 8 [106 S.Ct. 903, 907-908, 89 L.Ed.2d 1] (plur. opn. of Powell, J.).) The chilling effect of financial disincentives was recognized again in *United States v. Treasury Employees* (1995) 513 U.S. 454, 468-470 [115 S.Ct. 1003, 1014-1015, 130 L.Ed.2d 964], where the court struck down a congressional ban on the receipt by certain high-level government employees of honoraria for speeches. (See also *Va. Pharmacy Bd., supra,* 425 U.S. at pp. 756-757 [96 S.Ct. at pp. 1822-1823]; *Mine Workers v. Illinois Bar Assn.* (1967) 389 U.S. 217, 222 [88 S.Ct. 353, 356, 19 L.Ed.2d 426]; *Mazer v. Stein* (1954) 347 U.S. 201, 219 [74 S.Ct. 460, 471-472, 98 L.Ed. 630].)

benefit of the true owner, of any thing gained by fraud, accident, mistake, undue influence, violation of trust, or other wrongful act] and 3517 [confirming the duty to compensate for injury or damage caused by one's legal wrong]." (*Id.*, § 3, p. 3584.) In connection with more recent amendments to section 2225, the Legislature asserted, in a paraphrase from *Simon & Schuster*, that "[t]he state has a compelling interest in ensuring that convicted felons do not profit from their crimes and that the victims of crime are compensated by those who harm them." (Stats. 2000, ch. 261, § 1, subd. (b).)

Though there is no compelling interest in targeting a criminal's storytelling proceeds *in particular* for the purpose of compensating crime victims (*Simon & Schuster, supra*, 502 U.S. 105, 119-120 [112 S.Ct. 501, 510-511]), the state does have a compelling interest in using the fruits of crime *generally* for that purpose. (*Id.*, at pp. 118-121 [112 S.Ct. at pp. 509-511].) We may assume, in this regard, that the fruits of crime include a criminal's proceeds from exploiting the story of the crime. (*Id.*, at p. 119 [112 S.Ct. at p. 510].) The question thus arises whether section 2225(b)(1), within its sphere of operation, is narrowly tailored to ensure that the fruits of crime are used to compensate the victims of crime.

■ Of course, to be narrowly tailored does not require "that there be no conceivable alternative, but only that the regulation not 'burden substantially more speech than is necessary to further the government's legitimate interests' [citation]." (*Board of Trustees, State Univ. of N.Y. v. Fox* (1989) 492 U.S. 469, 478 [109 S.Ct. 3028, 3034, 106 L.Ed.2d 388].) We examine whether section 2225(b)(1) meets this test.[16]

Keenan urges that section 2225(b)(1) is *underinclusive*, because it confiscates profits from expressive activity, i.e., storytelling about one's crimes,

---

[16]Though it elsewhere clearly concluded that New York's Son of Sam law was a *content-based* regulation of speech which must be narrowly tailored to serve a *compelling* state interest, the *Simon & Schuster* majority also noted that "[b]ecause the [New York] law is so overinclusive," there was no need to address the New York Board's claim that the statute was *content neutral* under the test set forth in such cases as *Ward v. Rock Against Racism* (1989) 491 U.S. 781 [109 S.Ct. 2746, 105 L.Ed.2d 661] and *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41 [106 S.Ct. 925, 89 L.Ed.2d 29]. (*Simon & Schuster, supra*, 502 U.S. 105, 122 [112 S.Ct. 501, 511-512], fn.*) As the *Simon & Schuster* majority explained, *Ward* and *Renton* fall within a line of authority suggesting that regulations are content neutral, despite their incidental effect on some but not all speakers, if they are justified by concerns unrelated to the content of speech. (*Ward, supra*, at p. 791 [109 S.Ct. at pp. 2753-2754] [antinoise regulation requiring city sound equipment and city sound technician for outdoor concert, as applied to antiracism organization]; *Renton, supra*, at p. 48 [106 S.Ct. at p. 929] [zoning regulation of adult theaters].) The *Simon & Schuster* majority indicated that although a content-neutral regulation of expression need not serve a *compelling* state interest, it must nonetheless be "narrowly tailored" to serve whatever nonspeech interest the state asserts. (*Simon & Schuster, supra*, at p. 122, fn.* [112 S.Ct. at pp. 511-512].) The majority concluded that even if New York's Son of Sam law was analyzed as content neutral rather than content

while leaving undisturbed other gains and profits the criminal might realize from the crimes or their exploitation. Portions of the majority's discussion in *Simon & Schuster, supra,* 502 U.S. 105, imply such a flaw in the New York statute there at issue. At several points, the majority stressed that the statute singled out a criminal's profits from expressive activity to the exclusion of all other crime-related profits, and suggested that the state could demonstrate no compelling interest in such a distinction when fashioning a law to compensate crime victims from the fruits of crime. (*Id.,* at pp. 116, 119-121, 123 [112 S.Ct. at pp. 508, 510-511, 512].) Justice Blackmun suggested this was tantamount to a conclusion that the New York statute was underinclusive. (*Id.,* at pp. 123-124 [112 S.Ct. at pp. 512-513] (conc. opn. of Blackmun, J.).)

However, having determined that the New York law was overinclusive, the high court expressly stated it need not decide whether the law was underinclusive as well. (*Simon & Schuster, supra,* 502 U.S. 105, 122, fn.* [112 S.Ct. 501, 511-512].) Noting that Keenan's attack on the California statute was focused primarily on *Simon & Schuster,* the instant Court of Appeal similarly refused to address the issue of underinclusiveness. Because we hereafter conclude that California's law, like New York's, is overinclusive in any event, we pursue a similar course.

Indeed, any conclusion that the New York statute was underinclusive might not apply to California's law. As noted above, the California statute, unlike New York's, *does* confiscate at least one additional category of a criminal's crime-related profits, those derived from sales of memorabilia, property, things, or rights for a value enhanced by their crime-related notoriety value. (§ 2225(b)(2).) In the posture of this case, and lacking further development of the issue by the parties in their briefs, we need not and do not decide whether the California statute, which includes but reaches beyond speech-related profits, is underinclusive.

■ We are persuaded, however, that section 2225(b)(1), like the New York law at issue in *Simon & Schuster,* is overinclusive and therefore invalid. As did the New York statute, section 2225(b)(1) penalizes the content of speech to an extent far beyond that necessary to transfer the fruits of crime from criminals to their uncompensated victims. Even if the fruits of crime may include royalties from exploiting the story of one's crimes, section 2225(b)(1) does not confine itself to such income. Instead, it confiscates *all* a convicted felon's proceeds from speech or expression on *any* theme or subject which includes the story of the felony, except by mere

based, it was still "too overinclusive" to meet this test. (*Ibid.*) For reasons explained below, we reach a similar conclusion with respect to section 2225(b)(1).

passing mention. By this financial disincentive, section 2225(b)(1), like its New York counterpart, discourages the creation and dissemination of a wide range of ideas and expressive works which have little or no relationship to the exploitation of one's criminal misdeeds.

In at least one respect, the involuntary trust provision of section 2225(b)(1) operates more harshly against expressive materials that depict the creator's past crimes than did the escrow account provided for by the New York law at issue in *Simon & Schuster*. Under the New York statute, proceeds from a crime story contract were to be turned over to the New York Board for placement in escrow, but if, at the end of five years, no valid claims of the criminal's victims or creditors were pending, remaining funds in the account were returned to the criminal. (*Simon & Schuster, supra,* 502 U.S. 105, 109 [112 S.Ct. 501, 504-505]; see N.Y. Exec. Law § 632-a(4).) Under section 2225(b)(1), by contrast, any entrusted amounts not subject to legitimate individual claims at the end of the five-year trust period are turned over to the Controller for allocation to the Restitution Fund.[17]

Sinatra, Jr., nonetheless urges that two features of section 2225(b)(1) cure the overinclusiveness problem identified in *Simon & Schuster*. First, he notes, section 2225(b)(1), unlike New York's law, applies only to persons *actually found guilty* of *felonies* committed in this state. (§ 2225, subd. (a)(1), (2).) Thus, Sinatra, Jr., points out, California's statute, unlike New York's, presents no danger that an innocent person will be penalized, or that income from an expressive work will be confiscated simply for inclusion of a past offense that was minor, or for which the work's creator was never prosecuted. Second, Sinatra, Jr., observes, section 2225(b)(1) applies only to

---

[17]The ACLU suggests that, for this reason alone, the statute is an impermissibly overbroad deterrent to creative expression for compensation, since it forces a convicted felon to give up speech-related income for the benefit of *crime victims generally,* even after his own victims have been compensated. Section 2225(b)(1) does appear to impose an involuntary trust on the convicted felon's proceeds from materials that include the story of the crime, and to confiscate such proceeds after five years for the benefit of crime victims generally, even if there *never were* "beneficiaries" with specific claims against the felon. In order to impose an "express trust" in a bank depositary, the Attorney General must show it is "more probable than not" that beneficiaries exist (*id.,* subd. (e)(3)), and only a beneficiary or the Attorney General may obtain a preliminary injunction to prevent waste or dissipation of entrusted funds (*id.,* subd. (f)(1)). However, the trust character of the proceeds in the felon's hands, and their ultimate forfeiture to the state's Restitution Fund, do not appear to depend on the actual existence of uncompensated victims of the felon's crime.

The Attorney General responds that the state has a compelling interest in using the fruits of a particular crime not only to compensate that crime's direct victims, but also as a source of criminal restitution generally. As we conclude elsewhere in this opinion, section 2225(b)(1) is overbroad in any event, because it confiscates speech-related income on the basis of its content, and thus discourages such protected speech, far beyond the degree necessary to reach the fruits of crime.

expressive materials that include the "story" of a felony for which one was convicted, and exempts mere "passing mention of the felony, as in a footnote or bibliography." (*Id.*, subd. (a)(7).) These restrictions, Sinatra, Jr., insists, negate *Simon & Schuster*'s concern, with respect to the New York statute, that all profits from an expressive work would be confiscated though the work mentioned a past offense only "tangentially or incidentally." (*Simon & Schuster, supra*, 502 U.S. 105, 121 [112 S.Ct. 501, 511].)

We are not persuaded. In *Simon & Schuster*, the Supreme Court *illustrated* the overbroad sweep of the New York statute by showing that it encompassed even minor, unprosecuted offenses or mere "tangential[ ] or incidental[ ]" mention of past crimes in a larger context. (*Simon & Schuster, supra*, 502 U.S. 105, 121 [112 S.Ct. 501, 511].) But we do not read *Simon & Schuster* as suggesting that a statute which exhibited marginal narrowing in these particular regards would necessarily pass constitutional muster.

Instead, the court's concern was with the essential values of the First Amendment. As the court's lengthy discussion discloses, the vice of the New York law was that in order to serve a relatively narrow interest—compensating crime victims from the fruits of crime—the statute targeted, segregated, and confiscated *all* income from, and thus unduly discouraged, a wide range of expressive works containing protected speech on themes and subjects of legitimate interest, simply because material of a certain content— reference to one's past crimes—was included.

Thus, the California statute's limitation to *felony convictions* does not suffice to avoid an overbroad infringement of speech. As *Simon & Schuster* made clear, one motivated in part by compensation might discuss his or her past crimes, including those that led to felony convictions, in many contexts not directly connected to exploitation of the crime. One might mention past felonies as relevant to personal redemption; warn from experience of the consequences of crime; critically evaluate one's encounter with the criminal justice system; document scandal and corruption in government and business;[18] describe the conditions of prison life; or provide an inside look at the criminal underworld.

Mention of one's past felonies in these contexts may have little or nothing to do with exploiting one's crime for profit, and thus with the state's interest in compensating crime victims from the fruits of crime. Yet section 2225(b)(1) entrusts and permanently confiscates all income, whenever received, from all expressive materials, whatever their subject, theme, or

---

[18]As the Association of American Publishers, Inc., points out, discussion of governmental affairs is at the core of the First Amendment. (*Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030, 1034-1035 [111 S.Ct. 2720, 2723-2725, 115 L.Ed.2d 888].)

commercial appeal, that include a substantial description of such offenses, whatever their nature and however long in the past they were committed.[19] Thus, even as so limited to felony convictions, section 2225(b)(1) is not narrowly tailored to achieve the compelling interests it purports to serve.

As indicated above, the *Simon & Schuster* majority also found overbreadth in the New York statute because it confiscated profits from expressive works that "express[ed] the author's thoughts or recollections about his crime, *however tangentially or incidentally*." (*Simon & Schuster, supra*, 502 U.S. 105, 121 [112 S.Ct. 501, 511], italics added.) Sinatra, Jr., urges that the California statute avoids this defect because it applies only to expressive materials containing the "story" of the felony—i.e., a "depiction, portrayal, or reenactment" of the criminal episode (§ 2225, subd. (a)(7)), and because it expressly exempts mere "passing mention of the felony, as in a footnote or bibliography" (*ibid.*). Thus, Sinatra, Jr., suggests, the California statute applies only when an expressive work provides *narrative detail* about a felony for which the work's author or creator was convicted, and does not discourage mere *acknowledgement* of a prior felony conviction in the context of another subject.

The Attorney General echoes this view, suggesting that a "story," as defined by the section 2225, subdivision (a)(7), is a "vivid" depiction, portrayal, or reenactment. Further, the Attorney General suggests, the exemption is for "passing mention . . . , *as in* a footnote or bibliography" (*ibid.*, italics added), demonstrating that the example given is illustrative only, and that other forms of "passing mention" are also exempt.

These arguments do not convince us that section 2225(b)(1) focuses with sufficient precision on the fruits of crime, while leaving other speech-related income undisturbed. *Simon & Schuster* illustrated the overbreadth of the New York statute by observing that it reached even incidental and tangential mention of past crimes, but nothing in *Simon & Schuster* suggests the New York law could have cured its overinclusive effect simply by providing an exemption for tangential or incidental references. Moreover, *Simon & Schuster* neither stated nor implied that the federal Constitution might allow confiscation, on behalf of crime victims, of all proceeds from any expressive work that includes a descriptive account, or even a vivid account, of a past crime committed by the author.

[19]As indicated above, section 2225(b)(1) imposes an involuntary trust upon all "proceeds . . . received by or owing to" a convicted felon for expressive materials that include the story of the crime (*id.*, subd. (a)(9)). The statute imposes no limit on the time that may elapse between the crime and receipt of the proceeds. The trust period begins when proceeds are received or due, then continues, as extended pending the completion of suits by beneficiaries, for five years after the conviction, or five years after the payment of proceeds to the felon, "whichever is later." (§ 2225(b)(1).)

Such arbitrary demarcation lines do not comport with the basic rationale of *Simon & Schuster*. A statute that confiscates all profits from works which make more than a passing, nondescriptive reference to the creator's past crimes still sweeps within its ambit a wide range of protected speech, discourages the discussion of crime in nonexploitative contexts, and does so by means not narrowly focused on recouping profits from the *fruits of crime*.

Indeed, Keenan, joined by his amici curiae, urges that the "passing mention" exemption is so *imprecise* and *unclear* that it constitutes an impermissibly vague basis for the censorship of protected speech. (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 109 [92 S.Ct. 2294, 2299, 33 L.Ed.2d 222]; see also *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 874 [117 S.Ct. 2329, 2345-2346, 138 L.Ed.2d 874].) We need not resolve the vagueness issue, because we are persuaded that, by any reasonable interpretation, the statute remains overinclusive. Certainly the statutory definition of "story" includes any *substantial* account of the facts and circumstances of a past felony which led to conviction, and the "passing mention" exemption would not provide safe harbor to materials containing such a substantial account. But there are multiple contexts in which expressive materials, with diverse subjects and themes unrelated to the exploitation of one's crimes, might include substantial accounts of those episodes.

Had section 2225(b)(1) been in effect at the time and place of publication, the statute would have applied to numerous works by authors whose discussions of larger subjects make substantial, and often vividly descriptive, contextual reference to prior felonies of which they were convicted.[20] A statute which operates in this fashion disturbs or discourages protected speech to a degree substantially beyond that necessary to serve the state's compelling interest in compensating crime victims from the fruits of crime. Accordingly, we conclude, in conformity with *Simon & Schuster*, that section 2225(b)(1) is facially invalid under the First Amendment to the United States Constitution.

---

[20]These include, for example, Alex Haley and Malcolm X's The Autobiography of Malcolm X (Ballantine Books ed. 1992), in which the murdered civil rights leader describes early burglaries for which he was convicted (*id.*, pp. 161-172); Eldridge Cleaver's Soul on Ice (1968), which discusses his rapes of White women, for which he was incarcerated, as since-repented acts of racial rage (*id.*, pp. 14-15); memoirs by Charles Colson (Born Again (1976)), G. Gordon Liddy (Will! (1980)), and John Dean (Blind Ambition: The White House Years (1976)) detailing their criminal roles in the Watergate coverup; and the memoirs of Patricia Hearst, the scion of a publishing dynasty, who was kidnapped by the Symbionese Liberation Army and later participated with her captors in an armed bank robbery for which she was imprisoned (Hearst & Moscow, Every Secret Thing (1981)).

We reach a similar result under the liberty of speech clause of the California Constitution (art. I, § 2, subd. (a)).[21] The California provision provides similar, and sometimes greater, protection of speech than the First Amendment (e.g., *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366-367 & fn. 12 [93 Cal.Rptr.2d 1, 993 P.2d 334]), and neither party suggests any reason why it should provide lesser protection under the circumstances of this case.[22]

---

[21] We stress the narrow nature of our holding under both the federal and California Constitutions. We conclude only that section 2225(b)(1) is an overinclusive infringement of protected speech because it targets and confiscates *all* a convicted felon's proceeds from expressive materials that include any *substantial account* of the felony, in whatever context. We express no views on whether a statute targeting the income gained from expressive works that include accounts of the author's crimes could be drafted narrowly and precisely enough to overcome this problem of constitutional overbreadth. Moreover, nothing we say here precludes a crime victim, as a judgment creditor, from reaching a convicted felon's assets, including those derived from expressive materials that describe the crime, by generally applicable remedies for the enforcement and satisfaction of judgments. (See generally Code Civ. Proc., §§ 481.010 et seq., 680.010 et seq.) Nor do we intend, by our analysis in this case, to preclude further legislative steps, not directly related to the content of speech, to ensure that a convicted felon's income and assets, including those derived from storytelling about the crimes, are and remain available to compensate persons injured or damaged by the felon's crimes.

Finally, because we conclude that section 2225(b)(1) is overbroad for its legitimate purpose, we need not and do not address Keenan's contention, derived from Justice Kennedy's concurring opinion in *Simon & Schuster*, that a content-based regulation of speech is unconstitutional per se, and can never be justified by an interest of the state.

[22] The Attorney General argues that even if section 2225(b)(1), confiscating proceeds from expressive materials that include a felon's story of the crime, is invalid, we should affirmatively uphold section 2225(b)(2), which confiscates profits from memorabilia, property, things, or rights sold for values enhanced by their felony-related notoriety. The Attorney General represents that he has pending a case, *Lockyer v. Brown, aka "X-Raided"* (Super. Ct. Sacramento County, 1999, No. 99AS02640) seeking to confiscate, under section 2225(b)(2), "profits" from a compact disc entitled *Unforgiven*, which features defendant Brown, a rap artist and convicted murderer. At the Attorney General's request, we have taken judicial notice of the complaint in the Sacramento action.

However, as indicated above, neither the parties nor the Court of Appeal have focused on the "notoriety value" provisions of section 2225(b)(2), which is clearly severable, but have debated only whether section 2225(b)(1), dealing with *storytelling* about the crime, is constitutional. At oral argument, Sinatra, Jr.'s, counsel acknowledged that, despite its brief prayer for statutory "profits" (§ 2225, subds. (a)(10), (b)(2)) as well as "proceeds" (*id.*, subds. (a)(9), (b)(1)), Sinatra, Jr.'s, complaint is premised solely on section 2225(b)(1), the storytelling provision. Counsel for both parties agreed that the applicability and validity of section 2225(b)(2) are not before us except as raised, for the first time in this court, by the Attorney General as amicus curiae. Under the circumstances, we decline the Attorney General's invitation to opine upon the constitutionality of section 2225(b)(2), and we leave that issue for a case presenting it more directly.

Similarly, because we conclude that the challenged provisions are invalid infringements on speech, we need not and do not address Keenan's argument, raised at all stages, that application to him of section 2225, which was enacted long after the kidnapping of Sinatra, Jr., violates federal and state constitutional prohibitions of ex post facto legislation.

CONCLUSION

The trial court overruled Keenan's demurrer to Sinatra, Jr.'s, complaint, reasoning that the storytelling provision of California's statute (§ 2225(b)(1)), on which the complaint is solely based (see fn. 22, *ante*), is not unconstitutional. The Court of Appeal affirmed on similar grounds. Because we have concluded, contrary to both lower courts, that section 2225(b)(1) is invalid, we must reverse the judgment of the Court of Appeal.

The judgment of the Court of Appeal is reversed, and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BROWN, J.,** Concurring.—The majority correctly observes Civil Code section 2225, subdivision (b)(1),[1] shares the essential constitutional flaws condemned in *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.* (1991) 502 U.S. 105 [112 S.Ct. 501, 116 L.Ed.2d 476] (*Simon & Schuster*). Lest it seem the moral of the story is crime *does* pay, I write separately to dispel the understandable misconception that every "Son of Sam" law is unconstitutional. A properly drafted statute can separate criminals from profits derived from their crimes while complying with the First Amendment.

The *Simon & Schuster* court recognized the fundamental difference between works like The Confessions of Saint Augustine or Letter from Birmingham Jail and a ghost-written work entitled Snatching Sinatra. In the former examples, it is the public prominence, fame, wit, passion and eloquence of the authors that make these stories valuable. The "crimes" caused negligible harm to any actual victim and added nothing to the marketability of the stories. In contrast, Mr. Keenan's crime involved both a serious harm and is the source of his work's profitability; judging by the title of his literary effort, it is the celebrity status of his victim that makes the story noteworthy.

Notwithstanding today's decision, the state may constitutionally seize any asset of a criminal to redress the harm inflicted upon his victim. Additionally, the state may seize the fruits of the crime to render it unprofitable. For some works, like The Autobiography of Malcolm X, it may be difficult to determine the extent to which royalties result from the author's criminal

---

[1] All statutory references are to the Civil Code unless otherwise stated.

involvement or his literary skill. But the existence of hard cases that might win an as-applied challenge does not mean all such laws are facially unconstitutional. The First Amendment protects schlock journalism as well as great literature. Thus, Mr. Keenan has every right to tell his story. That does not mean the First Amendment guarantees he can keep the money. And therein lies the tale.

## I.

In *Simon & Schuster, supra*, 502 U.S. at pages 118-119 [112 S.Ct. at pages 509-510], the United States Supreme Court found New York's law could further two compelling state interests, which reflect the notion that crime should neither impoverish the victim nor enrich the criminal. Toward the former imperative, the court recognized the compelling interest in "ensuring that victims of crime are compensated by those who harm them." (*Id.* at p. 118 [112 S.Ct. at p. 509].) Toward the latter end, the court acknowledged the compelling interest in "ensuring that criminals do not profit from their crimes." (*Id.* at p. 119 [112 S.Ct. at p. 510].) The fulfillment of these interests restores both victim and criminal to the status quo ante and nullifies the tangible effects of the crime.

*Simon & Schuster* invalidated the New York law, however, because it seized speech-generated revenues without necessarily serving either state interest. "Should a prominent figure write his autobiography at the end of his career, and include . . . a brief recollection of having stolen . . . a nearly worthless item . . . the Board would control his entire income . . . ." (*Simon & Schuster, supra*, 502 U.S. at p. 123 [112 S.Ct. at p. 512].) Because the book's popularity would be due to the author's lawful prominence rather than his (perhaps previously undiscovered) crime, the author's income would not be a fruit of the crime, and thus seizure would not serve the antiprofit interest. Since the stolen item was nearly worthless, seizure would not serve the compensation interest. Accordingly, the court found the law "significantly overinclusive." (*Id.* at p. 121 [112 S.Ct. at p. 511].) A properly structured statute could avoid this overinclusivity by seizing only assets that would compensate the victim or render crime unprofitable.

The hypothetically prominent figure who mentions a minor theft in his autobiography bears a strong resemblance to Saint Augustine, and very little to defendant. Defendant's kidnapping created more than trivial harm, and it appears the notoriety of his criminal conduct is substantially responsible for the salability of his literary efforts. Thus, seizure of defendant's royalties serves one or both of the compelling state interests. If so, the state may constitutionally distinguish between Snatching Sinatra and The Confessions of Saint Augustine.

## II.

The constitutionality of seizing a criminal's assets to compensate his victims is beyond dispute. As *Simon & Schuster* observed, every state has a

body of tort law serving this exact interest. (*Simon & Schuster, supra,* 502 U.S. at p. 118 [112 S.Ct. at pp. 509-510].) To effect compensation, it is immaterial whether the funds come from the fruits of crime or the defendant's other assets.

Although compensation may have been a goal of New York's law, it failed to achieve it constitutionally. The law seized only those assets generated by the offender's storytelling. The problem was not the law's underinclusivity per se; after all, a statute need not solve every problem to be constitutional. A law would be underinclusive if it granted the victim only a partial share of the profits or compensation only up to a maximum sum.[2] These limitations, however, would not create the constitutional defect cited in *Simon & Schuster*: the content-based nature of the speech restriction.

The high court deemed the law presumptively unconstitutional because it imposed a financial burden on speakers due to the content of their speech. (*Simon & Schuster, supra,* 502 U.S. at pp. 115-116 [112 S.Ct. at pp. 507-508].) The New York statute "singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content." (*Id.* at p. 116 [112 S.Ct. at p. 508].) The dissenting opinion of Judge Newman in the court below demonstrated this content-based discrimination. (*Simon & Schuster, Inc. v. Fischetti* (2d Cir. 1990) 916 F.2d 777, 784 (*Fischetti*) (dis. opn. of Newman, J.).) Judge Newman observed the New York State Crime Victims Board applied the law to the autobiography of Jean Harris, who had killed " 'Scarsdale Diet' Doctor Herman Tarnower" (*Simon & Schuster,* at p. 111 [112 S.Ct. at p. 506]) because the book referred to the homicide in two chapters. (*Fischetti,* at p. 785.) If her book had concerned only the conditions at her prison, her royalties, though enhanced by the notoriety of her crime, would have been protected from seizure. (*Ibid.*) The distinction between the treatment of the actual book and the hypothetical book shows how "[t]he Son of Sam law establishes a financial disincentive to create or publish works with a particular content." (*Simon & Schuster,* at p. 118 [112 S.Ct. at p. 509].)

The content-based discrimination triggered strict scrutiny, whereby the state must show the law is narrowly drawn to further a compelling state interest. (*Simon & Schuster, supra,* 502 U.S. at p. 118 [112 S.Ct. at 509-510].) But New York limited the law's reach to " 'storytelling' " only; the

---

[2]Indiana law, for example, seizes only 90 percent of income derived from crime. (Ind. Code Ann. § 5-2-6.3-3(a)(1)(B).) According to the logic underlying the Laffer curve (i.e., by suppressing the profit incentive, a 100 percent taxation rate will not yield revenue), a defendant who may retain some profits will be more inclined to write about his crime, thereby generating income with which to compensate the victim. To a significant degree, the compensation and antiprofit imperatives are thus in tension.

court found no rational reason "why the State should have any greater interest in compensating victims from the proceeds of such 'storytelling' than from any of the criminal's other assets." (*Id.* at p. 119 [112 S.Ct. at p. 510].) The content-based limitation thus not only created the need to establish a compelling interest, it also rendered the state's interest less than compelling: "the State has a compelling interest in compensating victims from the fruits of the crime, but little if any interest in limiting such compensation to the proceeds of the wrongdoer's speech about the crime." (*Id.* at pp. 120-121 [112 S.Ct. at p. 511].) A law that shields assets such as Ms. Harris's home or stock portfolio from a compensation order hardly serves that interest.

The high court's reasoning shows that a law without this limitation would likely survive review, because the law would not be content based (thus avoiding strict scrutiny) and the law would narrowly serve the compelling interest of victim compensation, and thus, a fortiori, survive a lesser level of scrutiny. The Rhode Island Supreme Court discussed the validity of such a broader law in *Bouchard v. Price* (R.I. 1997) 694 A.2d 670 (*Bouchard*).[3] "Neither plaintiffs nor the Attorney General justified the act's applicability solely to expressive activity. The state's compelling interest in compensating victims from the proceeds of crime would be better served, for example, by making available to a victim *all* the criminal's assets, however and wherever derived. Such an expansion of the resources potentially available to a victim would avoid the statute's Achilles' heel of singling out only expressive activity for a special burden. We note that victims of a crime may normally bring a civil action against the offender to recover damages. After a judgment has been obtained, a victim may proceed against the defendant's assets whether or not these assets represent royalties obtained from the commercial exploitation of the crime. The enforcement of such a civil judgment against a defendant's assets following a personal injury or property loss has not heretofore presented a First Amendment problem." (*Bouchard*, at pp. 677-678, fn. omitted.) Indeed, *Simon & Schuster* itself approved of New York's content-neutral "statutory provisions for prejudgment remedies and orders of restitution." (*Simon & Schuster, supra*, 502 U.S. at p. 118 [112 S.Ct. at pp. 509-510]), and the majority likewise observes the propriety of content-neutral seizure of a defendant's assets to compensate a victim. (Maj. opn., *ante*, at p. 436, fn. 21.)

---

[3]The *Bouchard* court struck down a statute resembling New York's law in that it confiscated royalties from storytelling: i.e., " 'any publication, reenactment, dramatization, interview, depiction, explanation, or expression through any medium of communication which is undertaken for financial consideration. The term includes . . . a movie, book, magazine or newspaper article, tape recording, still photograph, radio or television program, live presentation, or reproduction or presentation of any kind.' " (*Bouchard, supra*, 694 A.2d at p. 674, quoting definition of "commercial exploitation" in Criminal Royalties Distribution Act of 1983, R.I. Gen. Laws § 12-25.1-2(3).)

A state may thus seize a defendant's assets in a content-neutral manner to ensure compensation. "*Simon & Schuster* does not . . . stand for the proposition that the government cannot recoup the proceeds of expressive activity relating to crime. Rather, the government cannot single out those proceeds for special treatment while ignoring other assets." (*U.S. v. Seale* (3d Cir. 1994) 20 F.3d 1279, 1285, fn. 7.) Courts may thus constitutionally order restitution from sources including, but not limited to, the defendant's income from storytelling. (*Ibid.*; *U.S. v. Jackson* (5th Cir. 1992) 978 F.2d 903, 915.) The law may prevent a criminal from enjoying any of his wealth while his victim remains uncompensated.

### III.

The state may also pursue the compelling interest of depriving criminals of their profits. New York's law was defective in this regard; it did not fully deprive criminals of their profits, only those profits resulting from storytelling. If Jean Harris exploited her criminal notoriety by writing a book, the state could confiscate those royalties. If instead of telling her story she chose to exploit her notoriety by charging $25 for underwear depicting the "Scarsdale Diet" logo with a red slash through it,[4] these royalties would be protected from seizure. The law's message was not that *crime doesn't pay* but that *speaking about crime doesn't pay.* Deterring crime is a compelling state interest, deterring speech is not. The disparate treatment accorded the income from her book and from the hypothetical merchandise reveals the discriminatory nature of the New York law.

Furthermore, the discrimination undermined the compelling nature of the interest served by the law. The state could not "offer any justification for a distinction between [storytelling] and any other activity in connection with its interest in transferring the fruits of crime from criminals to their victims." (*Simon & Schuster, supra,* 502 U.S. at pp. 119-120 [112 S.Ct. at p. 510].) There is a compelling interest in depriving criminals of their profits, but little if any interest in limiting such deprivation to the proceeds of the wrongdoer's storytelling. (See *id.* at pp. 120-121 [112 S.Ct. at pp. 510-511].)

Whether the law pursues the compensation or antiprofit interest, a limitation on the law's scope to storytelling is the Achilles' heel of a Son of Sam provision. Virginia law, therefore, bars a defendant from exploiting her criminal notoriety through any means. It seizes "[a]ny proceeds or profits received or to be received directly or indirectly by a defendant or a transferee of that defendant from any source, as a direct or indirect result of his

---

[4](See Learned, *The Constitutionality of Cashing in on Crime: Free Expression, Free Enterprise, and Not-Profit Conditions of Probation* (1995) 1 Suffolk J. Trial & Appellate Advoc. 79, fn. 10 (Learned) [describing the $25 boxer shorts marketed by convicted call girl/panderer Heidi Fleiss].)

crime or sentence, or the notoriety which such crime or sentence has conferred upon him." (Va. Code Ann. § 19.2-368.20.) Regardless of whether a Virginia criminal profited by selling her account of the crime, her autograph,[5] or her furniture for an exorbitant price,[6] she could not enjoy such revenues under this law.[7]

Section 2225, subdivision (b)(2) similarly avoids content discrimination in its seizure of profits. In conjunction with section 2225, subdivision (a)(10), it authorizes seizure of "all income from anything sold or transferred by the felon . . . including any right, the value of which thing or right is enhanced by the notoriety gained from the commission of a felony . . . ." The statute is indifferent to the *thing's* expressive or nonexpressive character, and if expressive, its content. The majority correctly observes section 2225, subdivision (b)(2) is "clearly severable" from subdivision (b)(1) (maj. opn., *ante*, at p. 436, fn. 22), and today's decision does not affect the continuing validity of the former provision.

The content neutrality of section 2225, subdivision (b)(2) is arguable, insofar as the law distinguishes between income-generating activity that exploits criminal notoriety and that which does not. For example, if Mr. Keenan published a book of poetry anonymously, the royalties would probably not qualify as profits as defined by the subdivision. But if he marketed the poems as "Sizzling Sonnets from the Sinatra Snatcher," the royalties would be enhanced by his criminal notoriety, and thus subject to seizure.[8]

On the other hand, *Simon & Schuster* observed statutes may be content neutral, and thus avoid strict scrutiny, where they are intended to serve

---

[5](See *Rolling v. State ex rel. Butterworth* (Fla.Dist.Ct.App. 1999) 741 So.2d 627.)

[6](See Learned, *supra*, 1 Suffolk J. Trial & Appellate Advoc. at p. 79, fn. 4 [describing sale of serial killer Jeffrey Dahmer's household goods].)

[7]Some states seizing profits do not expressly cover the fruits of criminal notoriety, instead defining as profits "any property obtained through or income generated from the commission of a crime; any property obtained by or income generated from the sale, conversion or exchange of proceeds of a crime, including any gain realized by such a sale, conversion or exchange; and any property that the offender obtained by committing the crime or income generated as a result of having committed the crime, including any assets obtained through the use of unique knowledge obtained during the commission of, or in preparation for the commission of, the crime, as well as any property obtained by or income generated from the sale, conversion or exchange of the property and any gain realized by such a sale, conversion or exchange." (Me. Rev. Stat. Ann. tit. 14, § 752-E; see also Colo. Rev. Stat. Ann. § 24-4.1-201; N.Y. Crime Victims Board Law § 632-a; N.D. Cent. Code § 32-07.1-01; W. Va. Code § 14-2B-3; Wyo. Stat. Ann. § 1-40-302.) It is not evident whether proceeds from writings about subjects unrelated to the crime would qualify as "income generated as a result of having committed the crime." (Me. Rev. Stat. Ann. tit. 14, § 752-E.)

[8]Statutes that exclude from coverage works about topics unrelated to the crime would face an even stronger challenge, as the topic (content) would determine whether the state seized the royalties.

purposes unrelated to the content of the regulated speech, notwithstanding their incidental effects on some speakers or messages but not others. (*Simon & Schuster, supra*, 502 U.S. at p. 122, fn. * [112 S.Ct. at pp. 511-512], citing *Ward v. Rock Against Racism* (1989) 491 U.S. 781 [109 S.Ct. 2746, 105 L.Ed.2d 661]; *City of Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41 [106 S.Ct. 925, 89 L.Ed.2d 29].) Although New York's law was too over-inclusive to qualify, a more narrowly drawn statute might face only intermediate scrutiny under *Ward* and *City of Renton*. (*Simon & Schuster, supra*, at p. 122, fn. * [112 S.Ct. at pp. 511-512].) Moreover, even if held to be content based, a statute that pursues a compelling interest (depriving criminals of all their profits) and is narrowly drawn (seizing only profits) could survive strict scrutiny.

A law that neutrally seizes all profits of crime comports with *Simon & Schuster, supra*, 502 U.S. 105, and thus the First Amendment. Even when his victim has been fully compensated, a criminal is not entitled to profit from his crimes.

## IV.

As the foregoing analysis shows, a state may constitutionally seize assets by pursuing the compelling interest of compensating victims, in which case the state may seize assets from any source (including assets that are not the fruits of the crime) up to the amount of the victim's damages. Likewise, a state may constitutionally seize assets by pursuing the compelling interest of depriving criminals of assets that are the fruits of crime. And there is no apparent reason why a state must select only one compelling interest to pursue. A state may pursue both interests separately; seizing all assets up to the amount of damage under the compensation rationale, and then all fruits of crime under the antiprofit theory. Because each phase would neutrally seize assets in furtherance of a compelling state interest, the law would avoid the constitutional pitfalls noted in *Simon & Schuster*.