Ronald A. Goldstein *vs.* Board of Registration of
Chiropractors.

Suffolk. January 8, 1998. - February 4, 1998.

Present: Abrams, Lynch, Greaney, Fried, Marshall, & Ireland, JJ.

*Administrative Law,* Administrative Procedure Act, Substantial evidence. *Due
Process of Law,* Adjudicatory proceeding. *Board of Registration of
Chiropractors. Chiropractor.*

This court declined to extend the "lost evidence" standard utilized in criminal
    cases to a disciplinary hearing before the Board of Registration of
    Chiropractors; therefore, in the face of a chiropractor's claim that certain
    unidentified records relevant to the issues before the board had been
    inadvertently misplaced by the police, due process required only that the
    board consider this claim. [612-613]
In a disciplinary hearing, the Board of Registration of Chiropractors was justi-
    fied in rejecting a chiropractor's claim that certain unidentified records
    relevant to the issues before the board had been lost; moreover, any error
    was harmless, where the majority of the board's findings depended on the
    testimony of the witnesses before them and not on the allegedly missing
    records. [613-614]
An amended order to show cause issued by the Board of Registration of
    Chiropractors fairly apprised the chiropractor of all of the violations that
    the board ultimately found that the chiropractor had committed and was
    constitutionally adequate notice. [615]
At a disciplinary hearing before the Board of Registration of Chiropractors,
    the chiropractor's rights to due process were not violated by the refusal of
    the board's presiding officer, who had solicited the board's expert witness
    to serve before the board, to recuse himself from the proceedings, where
    such solicitation was reasonable and did not suggest any bias or partiality
    on the part of the presiding officer. [615-616]

Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on June 4, 1996.

The case was reported by *Lynch,* J.

*Judith C. Knight* for the plaintiff.

*Jamie W. Katz,* Assistant Attorney General, for the defendant.

Fried, J. Ronald A. Goldstein challenges a decision of the
Board of Registration of Chiropractors (board) to revoke his

license to practice chiropractic. The board found overwhelming evidence that the appellant engaged in deceitful and gross misconduct, made inappropriate sexual comments to patients, took lewd, demeaning and clinically unnecessary actions, engaged in unprofessional conduct and harassment, was grossly negligent in his practice and overutilized certain inappropriate and impermissible chiropractic services, and made false or impermissible representations to patients about his ability to restore their health. We affirm.

# I

Goldstein had been a licensed chiropractor in Massachusetts since 1975. On March 10, 1995, the board commenced an administrative action directing Goldstein to show cause why his license should not be revoked given allegations concerning treatments he engaged in with six of his patients. The board then amended its order on June 5, 1995, and listed charges related to thirty-four female patients. The board held a formal hearing on the matter, during which it considered testimony from various experts and from fourteen of Goldstein's female former patients. On May 8, 1996, the board issued a final decision and order finding multiple violations of the relevant statutes and regulations and revoking Goldstein's license to practice chiropractic.[1]

The board found serious misconduct by Goldstein, beginning in the 1970s and continuing until the early 1990s. First, the board found that Goldstein conducted inappropriate procedures on each of the fourteen patients. In particular, the patients testified that Goldstein repeatedly conducted "chest spreads" and "uterine lifts" on them, often without their informed consent. In most instances, the chest spread consisted of Goldstein either removing a patient's shirt and bra or placing his hands beneath

---

[1]The board found that as to each of the fourteen patients Goldstein had committed some combination of violations of G. L. c. 112, § 61 (prohibiting deceitful or gross misconduct), 233 Code Mass. Regs. § 4.05 (1993) (forbidding misrepresentation, deceit, unprofessional conduct and gross misconduct), 233 Code Mass. Regs. § 4.08 (1993) (barring negligent practice, grossly negligent practice, reckless practice, or intentional misapplication of practice), 233 Code Mass. Regs. § 4.09 (5) (1993) (forbidding performing, providing or offering to perform any treatment which is beyond the proper scope of chiropractic practice), and 233 Code Mass. Regs. § 4.09 (6) (1993) (barring claims or representations that particular treatment guaranteed to result in cure or restoration of health).

them, centering his hands between the patient's breasts and pushing his hands outward in opposite directions. Most of the patients testified that during this procedure Goldstein's fingers would touch their breasts directly. The uterine lift generally consisted of Goldstein removing, lowering, or unbuttoning a patient's pants and pressing with his hands or fingers in the pubic and abdominal area. The board credited expert testimony by Dr. Lisa Shea that no "chest spread" procedure exists in chiropractic medicine, and that the closest recognized procedure to it — an anterior rib adjustment — is used for trauma to the chest and would be justified only on a diagnosis of rib misalignment. Although the uterine lift does exist, it is a rare procedure used for misalignment of the uterus and lower spine.

The board found that neither Goldstein's records nor the testimony of Goldstein and his patients justified his use of these procedures. None of the patients' records showed a diagnosis of rib subluxation misalignment, justifying the chest spread, or of lower spinal misalignment, uterine ptosis, lateral deviation of the uterus, or other uterine misalignment, justifying the uterine lift. Moreover, the reasons that Goldstein proffered to his patients to justify these procedures were at odds with the clinically justifiable reasons that he testified to before the board. For example, he most often told the fourteen patients who testified that the chest spread would ameliorate sinus trouble, breathing problems, and the common cold, even when a patient presented no such ailments.[2] One patient, Diana A, testified that Goldstein told her that the chest spread was to relieve "pain, not a specific pain." Another, Patty N, testified that Goldstein told her that she needed the chest spread to "line up" bones in her chest, even though she had not complained of chest pain or chest trauma. Still another patient, Kristy C, testified that Goldstein promised her that the chest spread would relieve "tension in the back." He repeatedly told these patients that the uterine lift would ease their menstrual cramps and improve their sex lives. On being informed by one patient that she had no problem with menstrual cramps, he said that the uterine lift would reduce the possibility of developing cramps in the future. Finally, Debra E testified

[2]One patient, Diane N, testified that Goldstein performed the chest spread on her year-round for her sinuses, even though her sinuses only bothered her in the summer. Another, Denise C, testified that Goldstein told her that the chest spread was necessary to ease her sinuses even though she had not said anything to Goldstein concerning a sinus condition.

that Goldstein told her that both the chest spread and uterine lift were "necessary" to help the Bell's Palsy condition in her face.[3]

In addition to the chest spread and the uterine lift, the board found that Goldstein performed other unjustified procedures. He conducted hypnosis on at least two of the fourteen patients who testified before the board, inviting one of them to participate in an evening hypnosis group at which she would be photographed nude. (She declined the invitation.) One patient, Rebecca F, testified that while she was pregnant, Goldstein often felt her pubic area and abdomen but failed to explain why; she testified that this "procedure" differed from the uterine lift. Similarly, Rebecca F testified that once when she had complained of having cold hands and feet Goldstein massaged the top of her pubic bone, again in a way that differed from the usual uterine lift. Finally, Kristy C testified that when she told Goldstein that she believed she might be pregnant, he did a "breast exam" as a gynecologist would and squeezed her nipples, saying that it would allow him to determine whether she was pregnant. Based on the testimony and its review of the available records, the board found all of these procedures to be inappropriate and clinically unjustified in violation of G. L. c. 112, § 61, and 233 Code Mass. Regs. §§ 4.08 and 4.06 (1993).

Second, the board found that even were these procedures medically justifiable in appropriate circumstances, the manner in which Goldstein performed them was not. Goldstein seldom examined his patients using traditional diagnostic methods, and instead often used the chest spread or uterine lift without asking for information from his patients that would justify such procedures. Diane K, for example, testified that Goldstein conducted a uterine lift on her within days of her having had a tubal ligation and without asking her about that procedure. Other patients testified that Goldstein conducted uterine lifts without asking whether the patient was pregnant or used an IUD, which Dr. Shea indicated should always be determined before applying the technique.

---

[3]The board also found that for two of the fourteen patients Goldstein conducted various chiropractic treatments, including the chest spread and the uterine lift, merely because the two women were his employees and he required them to receive his services as a condition of employment. The board condemned this practice as an unjustifiable overutilization of chiropractic procedures.

Similarly, the board credited Dr. Shea's testimony that even if a patient presented symptoms of rib misalignment, an anterior rib adjustment would be performed only once on that patient. In contrast, the fourteen witnesses testified that Goldstein sometimes performed the chest spread at every visit, up to three times per week. The board similarly found that a chiropractor's palms and fingers should not touch a woman's breasts during the course of an anterior rib adjustment, and that no chiropractic procedure requires cupping breast tissue or touching the nipple. Dr. Shea also stated that no chiropractic procedure requires a doctor's fingers to touch a patient's pubic hair. In contrast, the fourteen patients testified that Goldstein's fingers often touched their bare breasts and nipples and that his fingers touched their pubic hair, massaged their pubic area, and touched their inner thighs or genital area.[4]

Goldstein also improperly caused his patients to undress. He often required his patients to open, raise or remove their shirts during a chest spread or to remove or lower their pants and underwear during a uterine lift, even though Dr. Shea testified that these procedures could be done over a woman's clothing. Goldstein also sometimes asked his patients to undress for X-rays, requiring them to stand naked or with an opened robe, exposing their breasts and pelvis. One patient testified that prior to taking her X-ray, Goldstein lifted her robe and knelt in front of her, allegedly to position her correctly for the procedure. The board repeatedly found that Goldstein performed these various procedures in an improper manner in violation of G. L. c. 112, § 61, and 233 Code Mass. Regs. §§ 4.08 and 4.05 (1993).

Third, the board found that Goldstein made impermissible promises to treat a variety of illnesses and conditions for which he was not qualified. These included promises to treat deafness, endometriosis and sinus problems, to ease a patient's pain during intercourse, to increase a new mother's lactation, to straighten a patient's tipped uterus and adjust another patient's ovaries, to help patients conceive, to correct a gall bladder problem without surgery, to reduce menstrual cramps, to improve orgasm and patients' sex lives, and to "straighten" the

[4]Two patients, Patty N and Shirley F, testified that Goldstein grabbed or hugged them without their consent. Patty N testified that while she was standing with her shirt open and breasts exposed, Goldstein hugged her from behind in an attempt to "crack" her back, placing his hands directly on her breasts.

face of a patient suffering from Bell's Palsy. Goldstein told one patient that he specialized in pregnant women and could induce labor for her, and another that he specialized in sports injuries. The board concluded that these representations constituted words implying or guaranteeing a restoration of health, in violation of 233 Code Mass. Regs. § 4.09 (6) (1993).

Fourth, the board found that Goldstein repeatedly made inappropriate sexual comments to his patients. Goldstein apparently was "always making" comments of a sexual nature. We will not burden the pages of the Massachusetts Reports with the details of these comments. Suffice it to say that the board was fully justified in finding such comments to be lewd, demeaning, discourteous, and unprofessional, and a violation of G. L. c. 112, § 61, and 233 Code Mass. Regs. § 4.05.

Fifth, the board found that Goldstein harassed several of his patients when they attempted to terminate their treatments. Specifically, the board found that Goldstein repeatedly called and harassed patients Diane N and Ellen P after they attempted to terminate their visits. Ellen P testified that Goldstein told her that, if she did not return to his office, her insurance company would not pay her bills. She also stated that Goldstein scheduled her visits at night and on weekends, and that he conducted the chest spread procedure on her during the course of her weekend visits. The board found that such harassment violated 233 Code Mass. Regs. § 4.05.

Sixth, the board found that in at least one instance Goldstein disclosed one patient's information to another. Rebecca F testified that Goldstein told her information about a friend's medical state, which she immediately recognized was improper because the information seemed confidential in nature. The board found that this constituted gross misconduct in violation of G. L. c. 112, § 61, grossly negligent practice in violation of 233 Code Mass. Regs. § 4.08, and unprofessional conduct in violation of 233 Code Mass. Regs. § 4.05.

Goldstein defended his actions to the board by contradicting the testimony of the fourteen patients, particularly emphasizing that he did not touch their breasts with his fingers but perhaps with his palms, that he did not touch their nipples, and that he conducted the uterine lift appropriately, using his fists on the abdomen, not his fingers on the pubic area. He argued that the board could not fairly determine whether his use of these procedures was justified because his written records were

incomplete. He could not, however, identify which particular records were missing or how those records would substantiate his claims. He attributed the incompleteness of his records to several causes. First, he admitted that he had never created written treatment plans because he did not find them necessary. Second, he stated that he often discarded records more than seven years old because he considered them "junk." Third, he testified that his office had been subject to various floods and leaks over the years and that some of his records had suffered water damage and been destroyed. Finally, Goldstein testified that on May 31, 1994, the Burlington police conducted a search of his office and seized his computers and paper files. Although his files were returned in batches on June 22, 1994, July 27, 1994, and April 7, 1995, Goldstein claimed that some records were missing and that one of the computers seized by the police was broken when it was returned. Because in 1989 Goldstein began keeping his medical records on this computer using a bar code system called "Quick Notes," he claimed that he could not account for missing records from 1989 on.

## II

### A

Under the State Administrative Procedure Act, G. L. c. 30A, § 14, we uphold the board's decision if it is supported by "substantial evidence."[5] Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). There is no question that the board's decision to revoke Goldstein's license was supported by substantial evidence. Indeed, Goldstein does not raise such a challenge. Instead, he argues that because of the actions of the Burlington police, due process requires that we supplement the

---

[5]Goldstein suggests that, because the allegations before the board were similar to or could support criminal indictments, we should discard the substantial evidence standard altogether and apply a more stringent standard of review. This is incorrect as a general proposition, see *Vaspourakan, Ltd.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 347, 352 (1987) ("[c]ontrary to the licensee's argument, it is abundantly clear that substantial evidence is the appropriate standard regardless of whether the alleged violation is of a criminal statute or a [civil] regulation" and "regardless of the existence or outcome of a criminal court proceeding"), and irrelevant in the instant case, given that Goldstein had already been criminally prosecuted for his conduct. The criminal action was dismissed.

substantial evidence standard by applying the lost evidence standard used in the criminal context.

There is no question that Goldstein's due process rights were implicated in an adjudicatory proceeding in which his license could be revoked. See *Doherty* v. *Retirement Bd. of Medford*, 425 Mass. 130, 138 (1997); *Milligan* v. *Board of Registration in Pharmacy*, 348 Mass. 491, 495 (1965) ("fundamental considerations of fairness require [administrative] decisions . . . to be made objectively, under reasonable procedures, and with appropriate opportunity for judicial review"). The question is whether due process requires that we credit Goldstein's rather extravagant claim that, because the Burlington police misplaced or damaged some of his medical files he should be afforded the equivalent of transactional immunity as to any incident related to the information allegedly contained in those missing records. This is absurd. There is no evidence that the Burlington police intentionally destroyed the appellant's records, or that they acted in conjunction with or under the direction of the board. That both the police and the board are State actors is not enough to require such a result; the most that due process requires in this situation is that the board take into account Goldstein's contention as to why he has incomplete records bearing on many of the issues before it.

The board did this. The board heard and considered testimony from Goldstein, his wife, and a computer expert about the alleged destruction of records. The board made thirty-five findings of fact regarding Goldstein's record-keeping procedures and the search and seizure by the Burlington police, and drew five conclusions regarding the missing records. Specifically, the board found that due to inconsistencies in and between the testimony of Goldstein and his wife, who was also his office manager, it would reject his account of the missing computer files as self-serving. The board also rejected the testimony of Goldstein's computer expert because it found that the expert did not have personal knowledge of the data in the computer prior to its alleged damage.

The board's rejection of Goldstein's claims about the records was justified, and, even if it was not, any error was certainly harmless. Goldstein ignores that the majority of the board's findings did not depend on the records that it reviewed but instead on the testimony of the fourteen female former patients. In addition, we cannot imagine how the allegedly missing rec-

ords could have refuted a number of the charges against him.[6] Patient records, computerized or otherwise, are most unlikely to contain information demonstrating that a doctor did not place his hands on his patients' breasts, did not make lewd sexual comments to his patients, did not require his patients to undress for X-rays, did not conduct hypnosis or other impermissible procedures, did not promise to cure a variety of ailments, and did not disclose confidential patient information. Although perhaps the missing records could have assisted Goldstein if they documented that the chest spread and uterine lift procedures were justified by relevant diagnoses, that possibility seems quite remote given the fourteen patients' testimony that they did not complain of chest trauma or the other presenting conditions that justify these procedures. This possibility also seems contradicted by the spurious explanations for these procedures that Goldstein gave to these patients. Given that Goldstein was unable to identify *which* records the police allegedly destroyed and that he admitted that he himself had lost, discarded, or destroyed many of his own files, it cannot be said that the board denied Goldstein due process by considering only those records that he could produce.[7]

---

[6]Goldstein's argument about the missing computerized records is entirely irrelevant for four of the fourteen female patients who testified against him. Two of these patients, Diane K and Diane N, began and concluded their treatments prior to 1989, the year in which Goldstein began using the Quick Notes computer system to keep patient records. The two others were employees of Goldstein's whom he required to receive treatments as a condition of employment. Because the board found that this in itself was an unjustified application of chiropractic procedures, no records could have justified his treatment of these employee-patients.

[7]Even were we to apply the approach to lost evidence used in criminal cases, the board's findings would still be sufficiently supported. Under *Commonwealth v. Willie*, 400 Mass. 427, 432 (1987), when faced with lost evidence a court "must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." Here the question was whether the inadvertent loss of some records justified suppressing the use of other records. Even assuming that the actions of the Burlington police should be attributed to the board, there was no evidence that the Burlington police intended to damage Goldstein's computer records. (Indeed, Goldstein failed to convince the board that any records were even lost by the police, let alone that they were lost intentionally or as a result of gross negligence.) As to materiality, even if found, the missing computer files would not exonerate Goldstein from many of the board's findings. Given their irrelevance to most

## B

Goldstein next argues that his due process rights were violated because the board gave him insufficient notice of the allegations against him. Although an administrative deprivation of a professional license must be preceded by notice and an opportunity to be heard appropriate to the nature of the case, see *Langlitz* v. *Board of Registration of Chiropractors*, 396 Mass. 374, 376-377 (1985), there can be no doubt that such notice was given here. The board's amended order to show cause contained thirty-seven numbered allegations, each detailing the facts of Goldstein's treatment of thirty-four specific patients and alleging that such treatment constituted violations of the cited statute and regulations. Although Goldstein argues that the board "changed the focus" from the notice's "accusations of sexual misconduct to findings that the use of [the chest spreads and uterine lifts], though valid, was not warranted," this is misleading. The board's notice not only detailed all of the different types of wrongdoing that the board ultimately found Goldstein had committed, but also included a "catch-all" provision stating that, "[t]o the extent that any of the activities described [above] lack clinical justification, as alleged above, this also constitutes over-utilization of chiropractic services in violation of 233 [Code Mass. Regs. § ] 4.06." We conclude that Goldstein was fairly apprised of the allegations against him.

## C

Finally, Goldstein argues that his due process rights were violated because the board's presiding officer, Dr. Edward J. Barowsky, refused to recuse himself from the proceedings. During cross-examination, Goldstein's attorney elicited testimony from the prosecution's expert, Dr. Lisa Shea, that Dr. Barowsky had at some point prior to Goldstein's hearing solicited Dr. Shea to enter the pool of experts willing to serve as witnesses before the board. The record does not show, and Goldstein does not claim, that there was any conversation between Drs. Barowsky and Shea about Goldstein's case (or, indeed, about any specific case), nor about any matter, social or professional, other than a general invitation, which Dr. Barowsky apparently extended to various qualified chiropractors, to consider serving

---

of the findings described above, the loss of these records did not cause undue prejudice to Goldstein.

as a witness before the board. That the board should want Dr. Barowsky to develop such a panel of experts to testify in board proceedings is entirely reasonable and suggests nothing that smacks of bias or partiality. See *D'Amour* v. *Board of Registration in Dentistry*, 409 Mass. 572, 580 (1991) (finding that dentist "was not denied the right to an impartial hearing simply because the chairman of the board asked an expert to testify at the hearing").

## III

The decision of the Board of Registration of Chiropractors to revoke Ronald A. Goldstein's license to practice chiropractic is affirmed.

*So ordered.*