## OPINIONS OF THE JUSTICES.

### OPINION OF THE JUSTICES TO THE SENATE.

*Constitutional Law,* Freedom of speech and press, Severability. *Compensation of Victims of Violent Crimes. Practice, Civil,* Burden of proof. *Words,* "Proceeds related to a crime."

Discussion of the statutes enacted by various States to prevent criminal defendants from reaping financial gain from their crimes and to redirect defendants' funds to the compensation of crime victims. [1203-1205]

A bill pending before the General Court, requiring that certain contracts with a person who committed a crime be submitted to the division of victim compensation and assistance within the Department of the Attorney General for its determination whether the proceeds under the contract were substantially related to a crime and, if so, that the contracting entity pay over to the division any money that would otherwise be owed to the person who committed the crime for deposit into an escrow account for the victims of the crime, violated the right of freedom of speech as provided by the First Amendment to the Constitution of the United States or as provided in art. 16 of the Declaration of Rights of the Massachusetts Constitution, where the bill was a content-based regulation of speech that was neither necessary to serve a compelling State interest nor narrowly drawn to achieve that end, and where, in its practical effect, it would operate as a prior restraint on speech, while lacking the procedural protections required for any such prior restraint. [1205-1212]

On March 14, 2002, the Justices submitted the following answer to a question propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit their answer to the question set forth in an order adopted by the Senate on September 17, 2001, and transmitted to the Justices on September 21, 2001.[1] The order indicates that there is pending before the General Court a bill, Senate No. 1939,

---

[1] We invited interested parties to submit briefs which were due on November 16, 2001. Briefs were received from State Senator Cynthia Stone Creem, State Senator Cheryl A. Jacques, and State Representative Peter J. Koutoujian; National Crime Victim Law Institute, Matty Eappen Foundation, Mothers

entitled "An Act relative to profits from crime." A copy of the bill was transmitted with the order. The bill adds c. 258D to the General Laws, which requires that certain contracts with a person who committed a crime be submitted to the division of victim compensation and assistance within the Department of the Attorney General (division) for its determination whether the proceeds under the contract are substantially related to a crime. If so, the contracting entity must pay over to the division any monies which would otherwise be owed to the person who committed the crime. The funds are then to be deposited into an escrow account and made available to the victims of the crime.

The order indicates that grave doubt exists as to the constitutionality of the bill, if enacted into law, and requests our opinion on this question:

> "Does Senate No. 1939, by restricting the ability of criminal offenders to profit from their crimes, violate the right of freedom of speech as provided by the First Amendment to the Constitution of the United States (which the Fourteenth Amendment applies to the Commonwealth) or as provided in Article XVI of the Declaration of Rights of the Commonwealth?"[2]

1. *Provisions of the bill.* Proposed G. L. c. 258D requires any entity (contracting party) contracting with a "defendant" to submit a copy of the contract to the division within thirty days of the agreement if the contracting party knows or reasonably should know that the consideration to be paid to the defendant would constitute "[p]roceeds related to a crime." §§ 1, 2. It defines "[d]efendant" as "a person who is the subject of pending criminal charges or has been convicted of a crime or has voluntarily admitted the commission of a crime." § 1. It defines "[p]roceeds related to a crime" as "any assets, material objects, monies, and property obtained through the use of unique knowledge or notoriety acquired by means and in consequence

Against Drunk Driving, Office of Victim Advocate, National Organization of Parents of Murdered Children, National Center for Victims of Crime, National Organization for Victim Assistance, University of New Haven's Center for the Study of Crime Victims' Rights Remedies and Resources; Association of American Publishers, Inc., The Authors Guild, Magazine Publishers of America, Inc., Motion Picture Association of America, Inc., and Newspaper Association of America, Inc.

[2]We have not been asked to address, and therefore do not consider, any other possible constitutional infirmities of the bill.

of the commission of a crime from whatever source received by or owing to a defendant or his representative, whether earned, accrued, or paid before or after the disposition of criminal charges against the defendant." *Id.* Within thirty days of receipt of the contract, the division must determine whether the proceeds under the contract are "substantially related to a crime, rather than relating only tangentially to, or containing only passing references to, a crime," and must notify the contracting party of its determination. §§ 3, 4. If the division determines that the proceeds under the contract are substantially related to a crime, the contracting party has fifteen days in which to pay to the division the monies owed to the defendant under the contract or post a bond covering such amount. § 5. The contracting party may seek reconsideration of the division's determination, and may seek judicial review of the decision in accordance with G. L. c. 30A, § 14. § 6. However, the obligation to make payment to the division (or post a bond) is not stayed pending a decision on reconsideration or pending judicial review. *Id.*

The monies paid over by the contracting party are placed in an escrow account for the benefit of the victims of the defendant's crime. § 5. The division must notify all known victims of the defendant's crime that the defendant has such a contract and must publish a general notice in a newspaper every six months for a year. § 8. Within three years from the date of the last publication, victims may bring a civil action against the defendant, regardless of the earlier expiration of any applicable statute of limitations. § 9. The escrowed funds are used to satisfy any judgment obtained by the victim against the defendant; however, no funds can be transferred until the defendant is convicted of the crime or has voluntarily admitted the commission of the crime.[3] § 11. After all judgments against the defendant are paid, or if no victim files an action within the required three-year period, one-half the remaining escrowed funds are returned to the contracting party. § 13. The other half is deposited into the victim compensation fund maintained under G. L. c. 258C, § 4 (*c*). § 13.

2. *Background of the proposed legislation.* Many States have enacted statutes similar to Senate No. 1939 in an attempt to

---

[3]If the criminal proceedings are terminated without a conviction, the funds are returned to the contracting party. § 12.

prevent defendants from reaping financial gain from their crimes and to redirect a defendant's funds to the compensation of crime victims.[4] In 1977, New York enacted the nation's first such statute in response to the lucrative opportunities presented to the serial killer David Berkowitz, popularly known as the "Son of Sam," for the rights to his story. That statute required any entity contracting with a "person convicted of a crime"[5] for the "reenactment of [the] crime, by way of a movie, book, magazine article . . . or from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime" to submit a copy of the contract and pay over any income under that contract to the State's Crime Victims Board. N.Y. Exec. Law § 632-a(1) (McKinney 1982 & Supp. 1991). Several States, including Massachusetts, quickly followed by enacting similar laws. The first such statute in Massachusetts was modeled after the New York statute and followed its language closely. See G. L. c. 258A, § 8.

[4]See Ala. Code §§ 41-9-80 to 41-9-84 (Lexis 2000); Alaska Stat. § 12.61.020 (Lexis 2000); Ariz. Rev. Stat. Ann. §§ 13-4201 to 13-4202 (West 2001 & Supp. 2001); Ark. Code Ann. § 16-90-308 (Michie 1987); Cal. Civ. Code § 2225 (West Supp. 2002); Colo. Rev. Stat. Ann. §§ 24-4.1-201 to 24-4.1-207 (2001); Conn. Gen. Stat. Ann. § 54-218 (West 2001); Del. Code Ann. tit. 11, §§ 9101-9106 (Michie 1995); Ga. Code Ann. §§ 17-14-30 to 17-14-32 (Michie 1997); Haw. Rev. Stat. §§ 351-81 to 351-88 (1993); Idaho Code § 19-5301 (Michie 1997); Iowa Code Ann. § 910.15 (West 1994); Kan. Stat. Ann. §§ 74-7319 to 74-7321 (1992); Ky. Rev. Stat. Ann. § 346.165 (Michie 1997); Me. Rev. Stat. Ann. tit. 14, § 752-E (West Supp. 2001); Md. Code Ann., Crim. Proc. §§ 11-621 to 11-633 (2001); Mich. Comp. Laws Ann. § 780.768 (West 1998); Minn. Stat. Ann. § 611A.68 (West Supp. 2002); Miss. Code Ann. §§ 99-38-1 to 99-38-11 (Lexis 2000); Mont. Code Ann. § 53-9-104 (2001); Neb. Rev. Stat. Ann. §§ 81-1835 to 81-1837 (Lexis 1999); N.J. Stat. Ann. §§ 52:4B-27 to 52:4B-33 (West 2001); N.Y. Exec. Law § 632-a (McKinney 1996); N.D. Cent. Code § 32-07.1-01 (Michie 1996); Ohio Rev. Code Ann. §§ 2969.01-2969.06 (West 1997); Okla. Stat. Ann. tit. 22, § 17 (West Supp. 2002); Or. Rev. Stat. § 147.275 (1999); 42 Pa. Cons. Stat. Ann. § 8312 (West 1998); R.I. Gen. Laws §§ 12-25.1-2 to 12-25.1-4.1 (Lexis Supp. 2001); S.D. Codified Laws §§ 23A-28A-1 to 23A-28A-14 (Michie 1998); Tenn. Code Ann. §§ 29-13-401 to 29-13-411 (2000); Va. Code Ann. §§ 19.2-368.19 to 19.2-368.22 (Michie 2000); Wash. Rev. Code Ann. §§ 7.68.200-7.68.290 (West 1992); W. Va. Code §§ 14-2B-1 to 14-2B-11 (Lexis 2000); Wis. Stat. Ann. § 949.165 (West 1996); Wyo. Stat. Ann. §§ 1-40-301 to 1-40-308 (Lexis 2001).

[5]The term "person convicted of a crime" had included any person who "voluntarily and intelligently admitted the commission of a crime," even if the person was never prosecuted. N.Y. Exec. Law § 632-a(10)(b) (McKinney 1982 & Supp. 1991).

In 1991, the United States Supreme Court struck down the New York statute, declaring it unconstitutionally overbroad. *Simon & Schuster, Inc.* v. *New York Crime Victims Bd.*, 502 U.S. 105 (1991) (*Simon & Schuster*). Applying a standard of strict scrutiny, the Court found that the statute was not narrowly tailored to serve the State's compelling interests in ensuring that victims are compensated by those who harm them and in preventing criminals from profiting from their crimes. *Id.* at 121-123. Consequently, both New York and Massachusetts repealed their respective statutes. See N.Y. Exec. Law § 632-a (McKinney 1982 & Supp. 1991), repealed by L. 1992, c. 618, § 10; G. L. c. 258A, § 8, repealed by St. 1993, c. 478, § 3.

Senate No. 1939 is an attempt to reenact a similar statute in Massachusetts, addressing the concerns articulated by the United States Supreme Court in *Simon & Schuster, supra.* We are of the opinion that Senate No. 1939 has not successfully addressed those concerns and therefore still violates the First Amendment to the United States Constitution and art. 16 of the Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution.[6]

3. *Analysis.* We note at the outset that portions of Senate No. 1939 regulate nonexpressive activity, and those portions would not violate or otherwise impinge on the right of freedom of speech in the First Amendment or art. 16.[7] As such, our analysis of the constitutional infirmities of the bill pertains solely to the bill's proposed regulation of contracts involving expressive activity under the First Amendment.

a. *Content-based regulation.* Consistent with other courts, we conclude that Senate No. 1939 is a content-based regulation of speech. See, e.g., *Simon & Schuster, supra* at 115, 122 n.*; *Keenan* v. *Superior Court*, 27 Cal. 4th 413, 427-430 (2002); *Curran* v. *Price*, 334 Md. 149, 161-163 (1994);

---

[6]The analysis under art. 16 is the same as that under the First Amendment. See *Opinion of the Justices*, 430 Mass. 1205, 1209 n.3 (2000), citing *Walker* v. *Georgetown Hous. Auth.*, 424 Mass. 671, 674 (1997), and *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 558 (1979).

[7]Besides contracts for books, articles, television programs, and films, the bill covers a defendant's sale of tangible property where the value has been enhanced by the defendant's notoriety. See Making a Killing: Bill Takes Aim at Sales by Criminals, Boston Globe, Dec. 11, 2001, at B4; Sold to Highest Bidder: Online "Murderabilia," Boston Globe, Nov. 30, 2000, at B1. The sale of such items does not involve expressive activity, and regulation of those sales does not implicate the First Amendment or art. 16.

*Bouchard* v. *Price*, 694 A.2d 670, 676 (R.I. 1997). It burdens only expression with a particular content, namely, works that describe, reenact, or otherwise are related to the commission of a crime. A statute is content neutral only if "it is 'justified without reference to the content of the regulated speech.' " *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989), quoting *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Senate No. 1939 is content-based on its face, as it places a financial disincentive on speakers based on a specified content of their speech: speech substantially related to a crime. See *Simon & Schuster, supra* at 115-116, citing *Leathers* v. *Medlock*, 499 U.S. 439, 448-449 (1991). Indeed, under § 3, the division is required to analyze the content of any expressive work contemplated under a contract to determine whether the contract comes within the purview of the statute. See *Curran* v. *Price, supra* at 162-163. By definition, if the applicability of the bill's requirements can only be determined by reviewing the contents of the proposed expression, the bill is a content-based regulation of speech.

Supporters of the measure correctly note that the views and opinions being expressed about the defendant's criminal activity are irrelevant to the application of Senate No. 1939. Although the bill does not discriminate between particular viewpoints concerning crime, "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U.S. 221, 230 (1987), quoting *Consolidated Edison Co.* v. *Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980). See *Carey* v. *Brown*, 447 U.S. 455, 462 n.6 (1980) (statute is content-based even if it "does not discriminate on the basis of the speaker's viewpoint, but only on the basis of the subject matter of his message"). Here, expressive works are subject to the requirements of Senate No. 1939 based on their topic, i.e., based on the fact that they discuss or relate to a defendant's involvement in some form of criminal activity. The bill must therefore be classified as content-based.

To pass constitutional muster under the First Amendment, a content-based regulation must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Simon & Schuster, supra* at 118, quoting *Arkansas Writers' Project, Inc.* v. *Ragland, supra* at 231. See *National Amuse-*

*ments, Inc.* v. *Dedham*, 43 F.3d 731, 736-737 (1st Cir. 1995) (strict scrutiny standard applies to content-based regulations). The Supreme Court has identified two compelling State interests that are served by this type of statute: (1) "ensuring that victims of crime are compensated by those who harm them," and (2) "ensuring that criminals do not profit from their crimes." *Simon & Schuster, supra* at 118, 119. We must therefore determine whether Senate No. 1939 is narrowly tailored to advance either of these State interests. We conclude that it is not, finding Senate No. 1939 overbroad in at least the following respects.

As drafted, the proposed law extends to contracts with persons who were never even charged with any crime. A person who has "voluntarily admitted the commission of a crime" is included in the definition of "defendant." § 1. One of the main problems with the New York statute in *Simon & Schuster, supra* at 121, was the statute's similarly broad definition of "person convicted of a crime." As the Court noted, because the definition included "any author who admits in his work to having committed a crime, whether or not the author was ever actually accused or convicted," the New York statute reached a large pool of potential authors (such as artists, political dissidents and civil rights leaders), and thereby went far beyond what was necessary to serve the State's compelling interest. *Id.* at 121-122, citing N.Y. Exec. Law § 632-a(10)(b). The Court noted that the New York statute would have an adverse chilling effect on the future creation and dissemination of important literary works and would "reach[] a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated." *Id.* at 122.[8] Not surprisingly, other States have limited the scope of such laws to persons convicted

---

[8]The Supreme Court discussed this aspect of the New York statute in conjunction with the statute's application to works on any subject, regardless of how tangentially or incidentally related to a crime. *Simon & Schuster, Inc.* v. *New York Crime Victims Bd.*, 502 U.S. 105 (1992) (*Simon & Schuster*). The Court noted that "[t]hese *two* provisions *combine* to encompass a potentially very large number of works" (emphasis added). *Id.* at 121. The proposed law requires the division to review a work under a contract to determine whether it is "substantially related to a crime, rather than relating only tangentially to, or containing only passing references to, a crime." § 3. The term "substantially related to a crime" is not defined, but it apparently covers any work that contains more than just "passing references to a crime." § 3. We are not convinced that this requirement suffices to cure the overbreadth identified in *Simon & Schuster*. Works that contain more than "passing references" to a crime, authored by or concerning persons who were not charged with that

of (or at least charged with) a crime. See, e.g., Cal. Civ. Code § 2225(a)(1) (West Supp. 2002) (limited to "any person convicted of a felony, or found not guilty by reason of insanity"); Colo. Rev. Stat. Ann. § 24-4.1-201(1.5)(a)(I) (2001) (convicted persons); Iowa Code Ann. § 910.15(1)(a) (West 1994) ("initially convicted, or found not guilty by reason of insanity"); Md. Code Ann., Crim. Proc. § 11-621(b)(1) (Lexis 2001) (persons "charged with or convicted of a crime"); N.Y. Exec. Law § 632-a(2)(a) (McKinney 1996) (same); 42 Pa. Cons. Stat. Ann. § 8312(a) (convicted persons); Tenn. Code Ann. § 29-13-402(3) (accused and convicted persons); Va. Code Ann. § 19.2-368.19 (convicted persons). Thus, by defining "defendant" to include persons who, although not convicted or even formally accused, have "voluntarily admitted" to the commission of a crime, Senate No. 1939 suffers from the same defect that rendered the New York statute "significantly overinclusive" in *Simon & Schuster, supra* at 121.

With respect to all types of criminal defendants, the law also would impose financial burdens and uncertainties that would, in their practical effect, operate to chill a wide range of expression. The proposed law requires that all monies owed to a defendant be held in escrow by the division for at least three years. §§ 5, 9. If claims are filed, the funds are held until the conclusion of those proceedings. Ultimately, the funds are used to satisfy any judgment obtained against the defendant, with the remainder then split between the contracting party and the general victim compensation fund. § 13. Under this system, the defendant's funds are held for a lengthy and uncertain period of time, and one cannot predict how much of the funds (if any) will ultimately be released.

As the Supreme Court noted in *Simon & Schuster, supra* at 116-117, a provision that escrows a defendant's payments under a contract operates as a "financial disincentive" on both the defendant-author and the publisher. Such a provision may deprive the defendant-author of the financial resources needed to initiate a work, as it precludes advances from the publisher to

---

crime, still comprise a "wide range of literature." *Simon & Schuster, supra* at 122. See *Keenan* v. *Superior Court*, 27 Cal. 4th 413, 434-435 (2002) (exemption for works containing only "passing mention of the felony" does not cure statute's overbreadth, as it "still sweeps within its ambit a wide range of protected speech").

the author by which the author could support himself or herself during the preparation of the expressive work.[9] Similarly, the prospect of having all of his or her income held in escrow for a long period, with at best uncertain prospects as to how much of it (if any) will ever be paid, makes it very unlikely that a defendant-author would ever agree to undertake such a project. "No man but a blockhead ever wrote, except for money." *United States* v. *National Treasury Employees Union*, 513 U.S. 454, 469 n.14 (1995), quoting J. Boswell, Life of Samuel Johnson LL. D. 302 (R. Hutchins ed. 1952). "[T]o deny compensation for certain speech will chill such speech." *Curran* v. *Price*, 334 Md. 149, 162 (1994). Publishers who can offer potential authors only the prospect of a long delay before payment of a completely uncertain amount of money (if any) will have a difficult time convincing defendants to agree to author their stories or to speak with writers who can use their material to create an expressive work. "Publishers compensate authors because compensation provides a significant incentive toward more expression." *United States* v. *National Treasury Employees Union, supra* at 469. Interfering with publishers' ability to compensate an entire class of authors will likely prevent publishers from preparing and publishing works concerning persons who have, at some point in their lives, engaged in criminal activity. The administrative burdens associated with notifying the division, challenging division determinations, and depositing funds with the division would make publishers less inclined to pursue such works. Although it is impossible to measure the cost of works that would never come to fruition because of the multiple deterrent effects of the bill, "we cannot ignore the risk that it might deprive us of the work of a future Melville or Hawthorne." *Id.* at 470. These burdens extend to works and authors far beyond those necessary to serve the compelling State interests articulated here.

In comparison to the bill's proposed interference with the publishing industry's ability to obtain information from or publish works about any criminal, we note that there are other

---

[9]Because the proposed law requires the contracting party to pay over all funds owed to "the defendant or his representative," see § 5, it may also deter literary agents from representing defendant-authors. Cf. *Simon & Schuster, supra* at 110 (provision in New York statute permitted payments to literary agents and other representatives "for the necessary expenses of the production of the moneys [*sic*] paid into the escrow account").

less cumbersome and more precise methods of compensating victims and preventing notorious criminals from obtaining a financial windfall from their notoriety. Probation conditions, specifically designed to deal with a defendant's future income and obligations, may be imposed. See *Commonwealth* v. *Power*, 420 Mass. 410 (1995), cert. denied, 516 U.S. 1042 (1996). Victims may, as part of any civil action against a defendant, seek writs of attachment against the defendant's assets or writs of trustee process of amounts owed to the defendant, including (but not limited to) assets or earnings derived from expressive activity. Injunctive relief is also available. See Eappen *vs.* Woodward, U.S. Dist. Ct. No. 98-CV-11173 (D. Mass. June 29, 1998). While such methods may impinge on a defendant's expressive activity, they are specifically adapted to the facts and circumstances of each case. The proposed bill, sweeping broadly across the publishing and entertainment industries and interfering with an entire category of speech, is not narrowly tailored.

b. *Prior restraint.* Beyond our concerns about the bill's overbreadth, we also note that, in its practical effect, it would operate as a prior restraint on speech, while lacking the procedural protections required for any such prior restraint. As discussed above, the delays and uncertainties surrounding compensation for such works will, even when they do not deter such works entirely, at least postpone their production and ultimate release. And, if the division determines that the proceeds are "substantially related to a crime," that determination may operate to halt the production of the work entirely. Any system of prior restraints "comes . . . bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 70 (1963).[10]

In order to pass constitutional muster under the First Amend-

---

[10]Although the term "prior restraint" has customarily been applied to censorship and licensing schemes aimed at preventing certain speech from ever reaching the "marketplace of ideas," at least one court has applied the term in the context of a law comparable to Senate No. 1939. See *Curran* v. *Price*, 334 Md. 149, 167-170 (1994). The *Curran* court noted that, although Maryland's statute did not restrain individuals from writing or publishing crime-related works, it did "bar them from receiving any earnings from such works, at least during the period of review by the Attorney General." *Id.* at 167. While the statute did not explicitly censor expression, it could nonetheless constitute a prior restraint because of the financial restrictions it placed on crime-related expression. See *id.* at 168. In reaching this conclusion, the *Curran* court relied on *Riley* v. *National Fed'n of the Blind of N.C., Inc.*, 487 U.S.

ment, a statute that establishes a system of prior restraints must provide procedures that will offer "adequate safeguards against undue inhibition of protected expression." *Freedman* v. *Maryland*, 380 U.S. 51, 60 (1965). See *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 559 (1975). Senate No. 1939 fails to provide those procedural safeguards.

The Supreme Court has specified three procedural requirements that must be included in any system of prior restraint. *Freedman* v. *Maryland*, *supra* at 58-59. First, the State must bear the burden of proving that a particular work falls within the regulatory sweep of the statute. Second, any restraint prior to judicial determination must be brief and only for the purpose of preserving the status quo; thus, the statute "cannot be administered in a manner which would lend an effect of finality to the [State's] determination." *Id.* at 58. Third, there must be a prompt final judicial determination. *Id.* at 59. See *Curran* v. *Price*, *supra* at 168-169.

Here, the proposed initial review process fails to satisfy these procedural requirements in several respects. Although Senate No. 1939 does not have a "rebuttable presumption" that a work falls within the reach of the statute, as was the case in Maryland's statute, see *Curran* v. *Price*, *supra* at 169, the proposed bill makes the division's determination (or the program director's decision on reconsideration) final unless the contracting party seeks judicial review. See §§ 5, 6. Thus, the division does not have the burden of initiating judicial proceedings, and there is no judicial review unless the contracting party appeals. This is in conflict with the Supreme Court's pronouncement that "only a procedure *requiring* a judicial determination suffices to impose a valid final restraint" (emphasis added). *Freedman* v. *Maryland*, *supra* at 58.

781 (1988), which involved a statute that prohibited professional (paid) fundraisers from soliciting funds without first obtaining a license, but allowed unpaid volunteer fundraisers to solicit immediately on applying for a license. The Supreme Court invalidated the statute because it lacked adequate procedural safeguards to protect the First Amendment rights of paid fundraisers. *Id.* at 801-802. The *Curran* court found the analysis in *Riley* applicable to the statute at issue because, like the "speakers in *Riley* [who] were not barred from speaking[, because] they could still solicit funds on a voluntary basis . . . the authors of the works in the instant case may still communicate their views without the benefit of compensation." *Curran* v. *Price*, *supra* at 168. We agree with this analysis and therefore analyze the bill as a form of prior restraint.

Furthermore, § 6 of the proposed law provides for judicial review under G. L. c. 30A, § 14, which places the burden of demonstrating error on the party seeking review (here, the contracting party) and which requires the reviewing court to give substantial deference to the agency's decision. See *Goldstein* v. *Board of Registration of Chiropractors*, 426 Mass. 606, 612 (1998) (agency's decision must be affirmed if supported by "substantial evidence"); *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992) (standard of review under G. L. c. 30A, § 14, "is highly deferential to the agency"). This procedure does not place the burden of proof on the division, but instead requires the contracting party to prove that the division's decision cannot stand even under the deferential review standards of G. L. c. 30A, § 14. Thus, the bill fails to satisfy the requirement that the burden of proof be placed on the State. *Freedman* v. *Maryland, supra.*

Finally, Senate No. 1939 provides no assurance of prompt judicial determination. It has no requirement that courts hear such appeals in any specific time frame or even that they act "promptly," and therefore the "[r]isk of delay is built into [the proposed statute], as is borne out by experience." *Id.* at 55. In *Freedman* v. *Maryland, supra*, the Court held that a delay of six months is longer than permissible. *Id.* Here, although the bill limits the division's initial review process to thirty days and the program director's review on reconsideration to twenty days, see §§ 3, 6, the time period for judicial review will be far greater. The total elapsed time from submission of the contract until a final judicial determination is obtained will regularly exceed six months, which is itself already an impermissible delay. See *id.*

4. *Conclusion.* Therefore, we find that Senate No. 1939, as drafted, violates the right of freedom of speech in the First Amendment and art. 16.[11] The various provisions of the bill that render it unconstitutional cannot be severed from the statute

---

[11]We do not suggest that legislation on this subject is automatically violative of the First Amendment or art. 16. "Nor do we intend, by our analysis in this case, to preclude further legislative steps, not directly related to the content of speech, to ensure that a convicted felon's income and assets, including those derived from storytelling about the crimes, are and remain available to compensate persons injured or damaged by the felon's crimes." *Keenan* v. *Superior Court, supra* at 436 n.21. "A properly drafted statute can separate criminals from profits derived from their crimes while complying with the First Amendment." *Id.* at 437 (Brown, J., concurring).

without undermining the integrity and purpose of the bill. See *Commonwealth* v. *Chou*, 433 Mass. 229, 238 (2001), quoting *Commonwealth* v. *Petranich*, 183 Mass. 217, 220 (1903) (unconstitutional statutory provision is severable if the remaining provisions can "stand independently of it, and if there is no such connection between the valid and the invalid parts that the Legislature would not be expected to enact the valid part without the other").

The answer to the question is, "Yes."

The foregoing answer and opinion are submitted by the Chief Justice and the Associate Justices subscribing hereto on the 14th day of March, 2002.

MARGARET H. MARSHALL

JOHN M. GREANEY

RODERICK L. IRELAND

FRANCIS X. SPINA

JUDITH A. COWIN

MARTHA B. SOSMAN

ROBERT J. CORDY